## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

JOHN DOE,

        Plaintiff,

v.

EMORY UNIVERSITY,

        Defendant.

Civil Action File No.:

_____

## COMPLAINT

Plaintiff John Doe[1] (hereinafter referred to as "Plaintiff" or "John Doe") files his complaint for damages and other remedies against Emory University, showing the Court as follows:

## NATURE OF THE ACTION

1.    This action arises out of the willful and unlawful actions of Emory University taken throughout the investigation and adjudication of patently false sexual misconduct allegations against Plaintiff John Doe, which were guided by gender bias and resulted in an erroneous finding of responsibility, in violation of

---

[1] Plaintiff files a motion to proceed anonymously using a pseudonym due to the sensitive and personal nature of the allegations involved. Plaintiff's identity is known to Defendant.


Title IX of the Educational Amendments of 1972.

2.     Complainant Jane Roe[2] (hereinafter "Roe" or "Complainant") went to Emory's Title IX Office following a consensual sexual encounter with Plaintiff at a fraternity party on April 20, 2019, and incredibly reported allegations of a violent sexual assault that was not supported by the evidence. Roe's own story shifted so much throughout the investigation that she even admitted at the hearing that she *lied* during her interviews because she "wanted her complaint to be believed."

3.     On information and belief, Roe was embarrassed by the fact that she felt rejected during the sexual encounter and regretted engaging in the encounter with Plaintiff. Roe decided to file false allegations against Plaintiff solely because she felt embarrassed for her own decisions.

4.     However, even Roe's admission of lies was not enough to overcome the University's predisposed notion of Plaintiff's guilt as a male accused, as the panel determined that Roe presented no credibility concerns.

5.     From inception, Emory's Title IX investigation and disciplinary process was flawed, biased, and deficient. Throughout the investigation and hearing process, Plaintiff was subjected to unfair and gender-biased treatment: Defendant

---

[2] Jane Roe is a pseudonym.

resolved all factual inconsistencies in favor of Roe's claims; Roe and her female witnesses had their statements taken at face value and were not asked any questions that could negatively impact their credibility, while Plaintiff and his male witnesses were met with hostility and skepticism; and, overall, the investigative report was tailored towards a predetermined outcome of finding Plaintiff guilty as a male accused, regardless of the actual facts of the case.

6.      Worse, despite the fact that the investigation continued well past August 2020, and therefore after the new August 2020 Title IX regulations were federally mandated, the University refused to apply the new regulations and instead chose to maintain parallel policies for the sole purpose of depriving Plaintiff of the procedural protections that he would have been granted under the new regulations.

7.      As a result of this flawed process, Plaintiff was found responsible for Nonconsensual Sexual Intercourse and Nonconsensual Sexual Contact and sanctioned to a one semester suspension. However, the courses which are required of Plaintiff in order to complete his undergraduate education are only offered in the spring semester, thereby effectively sanctioning Plaintiff to a one-year suspension that will preclude him from timely completion of his degree and beginning his employment, and will forever mark his educational records.

8.      By employing gender-based, pre-determined presumptions of

Plaintiff's guilt from the outset, and by imposing an unreasonable sanction, Defendant displayed anti-male bias.

9.      By violating its own policies and depriving Plaintiff of a fair and impartial disciplinary process, Defendant breached express and implied agreements with Plaintiff and acted in bad faith in failing to fulfill its promises to him as an enrolled student paying tuition at Emory.

10.     Defendant engaged in a flawed, biased, and deficient investigation and disciplinary process, which rendered a finding and sanction that were arbitrary, capricious, unreasonable, fundamentally unfair, and not supported by sufficient evidence.

11.     As a result of Defendant's discriminatory and unlawful actions, Plaintiff has sustained damages, including but not limited to past and future economic losses, reputational harm, and lost future educational and career prospects.

12.     Accordingly, Plaintiff brings this action to obtain monetary and injunctive relief.

## **THE PARTIES**

13.     Plaintiff is a natural person and is a resident of Illinois. At all relevant times herein, Plaintiff was enrolled as a full time, tuition-paying, undergraduate student at Emory.

14.    Defendant Emory University is a partially federally funded private university located in Atlanta, Georgia, where it maintains its principal offices and place of business.

## JURISDICTION AND VENUE

15.    This Court has federal question, diversity and supplemental jurisdiction pursuant to 28 U.S.C. § 1331, 28 U.S.C. § 1332 and 28 U.S.C. § 1367 because: (i) the federal law claims arise under the constitution and statutes of the United States; (ii) Plaintiff and Defendant are citizens of different states and the amount in controversy exceeds $75,000; and (iii) the state law claims are so closely related to the federal law claims as to form the same case controversy under Article III of the United States Constitution.

16.    This Court has personal jurisdiction over Defendant Emory University on the ground that it is conducting business within the State of Georgia.

17.    Venue for this action properly lies in this district pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claim occurred in this judicial district.

## FACTUAL ALLEGATIONS COMMON TO ALL CLAIMS

**I.    BACKGROUND.**

**A. The April 2011 "Dear Colleague Letter": The Office for Civil**

**Rights Places Pressure on Universities to Aggressively Pursue Sexual Misconduct Complaints.**

18.     On April 4, 2011, the Department of Education's Office for Civil Rights ("OCR") issued a guidance letter to colleges and universities in receipt of federal funding, which became widely known as the "April 2011 Dear Colleague Letter" (the "DCL").

19.     The DCL advised recipients that sexual violence constitutes sexual harassment within the meaning of Title IX of the Education Amendments of 1972 and its regulations, and the DCL directed schools to "take immediate action to eliminate the harassment, prevent its recurrence and address its effects." DCL at 4.

20.     The DCL responded, in part, to a special investigative report published by National Public Radio and the Center for Public Integrity, which proclaimed a campus rape epidemic and criticized the OCR for its lax response to what the report characterized as a social problem of critical importance. *See* Joseph Shapiro, *Campus Rape Victims: A Struggle for Justice*, National Public Radio (Feb. 24, 2010), http://www.npr.org/templates/story/story.php?storyId=124001493.      The      report described in detail the obstacles faced by sexual assault victims in obtaining redress though college disciplinary proceedings, and how victims who did engage in the college disciplinary process suffered additional trauma as a result. Much of the

report focused on underreporting, re-traumatization of victims, rape myth adherence on college campuses (e.g., that women invite rape, that rapes are just drunk hook-ups, and that women routinely lie), and young men's cultural adherence to the sexual aggressor role.

21.    The OCR further relied on faulty statistics in sounding its "call to action" for campuses nationwide—that "about 1 in 5 women are victims of completed or attempted sexual assault while in college." DCL at 2. The researchers behind this study subsequently invalidated that statistic as a misrepresentation of the conclusions of the study, and warned that it was "inappropriate to use the 1-in-5 number as a baseline . . . when discussing our country's problem with rape and sexual assault on campus." *See* Christopher Krebs and Christine Lindquist, *Setting the Record Straight on "1 in 5"*, Time Magazine (Dec. 14, 2015), http://time.com/3633903/campus-rape-1-in-5-sexual-assault-setting-record-straight/.

22.    Relying on the faulty one-in-five statistic, the OCR, through the DCL, minimized due process protections for the accused by, among other things, mandating the adoption of a relatively low burden of proof—"more likely than not"— in cases involving sexual misconduct, expressly prohibiting colleges from applying a higher standard of proof.  (DCL at 10-11).

23.     The DCL advised that schools responding to Title IX complaints should "minimize the burden on the complainant" (DCL at 15) and focus on victim advocacy.  For example, it stated (DCL at 12) that schools should give both parties the right to appeal a decision – in other words, if an accused student was found not responsible, the complainant could then appeal and force the respondent to defend the charges all over again, functionally constituting double-jeopardy. Additionally, the DCL stated that schools must take steps to protect the complainant, as necessary, including taking interim steps before the final outcome of the investigation.  Such steps include transferring alleged perpetrators, if necessary, away from shared courses or housing. (DCL at 15-16).

24.     The DCL (p. 12) also strongly discouraged allowing cross-examination because it "may be traumatic or intimidating" to the alleged victim.

25.     Despite its purported purpose as a mere guidance letter, the Department of Education treated the DCL as a binding regulation and pressured colleges and universities to aggressively pursue investigations of sexual assault on campus.

26.     Before the DCL, colleges and universities generally did not use their disciplinary procedures to adjudicate sexual misconduct cases and certainly not in the manner and frequency that they have since the issuance of the DCL.

27.     After the DCL was published, schools changed their sexual assault and

sexual harassment policies and procedures.

28.     On April 29, 2014, OCR issued additional directives to colleges and universities in the form of a guidance document titled *Questions and Answers on Title IX and Sexual Violence* ("OCR's April 2014 Q&A") which was aimed at addressing campus sexual misconduct policies, including the procedures colleges and universities "must" employ "to prevent sexual violence and resolve complaints" and the elements that "should be included in a school's procedures for responding to complaints of sexual violence." https://www2.ed.gov/about/offices/list/ocr/docs/ qa-201404-title-ix.pdf OCR's April 2014 at 9,12.

29.     The OCR's April 2014 Q&A advised schools to adopt a trauma informed approach, advising, for example, that hearings should be "conducted in a manner that does not inflict additional trauma on the complainant." *Id*. at p. 31.

30.     In addition, OCR's April 2014 Q&A continued OCR's quest to hamper students' ability to defend themselves by reducing or eliminating the ability to expose credibility flaws in the allegations made against them.  For example, the document states that schools:

    a.  "must not require a complainant to be present" at sexual misconduct disciplinary hearings (p. 30);

    b.  may decide to eliminate all opportunities for "cross-examination"

(p. 31); and

c. must avoid "revictimization" by minimizing the number of times a victim is interviewed so "complainants are not unnecessarily required to give multiple statements about a traumatic event" (pp. 30, 25).

31. Neither OCR's April 2014 Q&A nor the DCL were subject to notice-and-comment rulemaking, and both the OCR's April 2014 Q&A and the DCL constituted substantive decision-making.

32. In the same month that the OCR issued its April 2014 Q&A on Title IX, the White House issued a report titled *Not Alone*, which included a warning that if the OCR finds a school in violation of Title IX, the "school risks losing federal funds." *See* White House Task Force to Protect Students from Sexual Assault, *Not Alone* (Apr. 2014), *available at* https://obamawhitehouse.archives.gov/sites/ default/files/docs/report_0.pdf.  The report further advised that the Department of Justice ("DOJ") shared authority with OCR for enforcing Title IX, and could therefore initiate investigation, compliance review, and/or litigation against schools suspected of violating Title IX.

33. In June 2014, then-Assistant Secretary of Education Catherine Lhamon testified before the United States Senate, warning that if the OCR could not secure

voluntary compliance with the DCL from a college or university, it could elect to initiate an administrative action to terminate federal funds or refer the case to the Department of Justice. *See* Testimony of Catherine E. Lhamon, Assistant Secretary Office for Civil Rights, U.S. Department of Education (June 26, 2014), https://www2.ed.gov/about/offices/list/ocr/correspondence/testimony/20140626-sexual-violence.pdf.

34.    To support its enforcement of the DCL, the OCR hired hundreds of additional investigators. To date, OCR has conducted over five hundred investigations of colleges for the potential mishandling of complaints of sexual misconduct. *See Title IX: Tracking Sexual Assault Investigations*, Chronicle of Higher Education, https://projects.chronicle.com/titleix/ (last visited April 25, 2021).

35.    Emory found itself on the receiving end of such investigations when the University was publicly named as one of the initial 55 universities under OCR investigation for its handling of sexual assault complaints. *See* Karishma Mehrotra, *Emory Under Federal Review for Sexual Violence Response,* The Emory Wheel (May 1, 2014), available at https://emorywheel.com/emory-under-federal-review-for-sexual-violence-reponse/.

36.    This investigation resolved in 2019 by way of Emory requesting and

signing a "resolution agreement" with the OCR, which, among other things required that "the University Title IX Coordinator will review responses to complaints submitted to the University from August 1, 2018 through May 31, 2019 for compliance with Title IX under the University's revised procedures and provide to OCR specific files related to the Title IX Coordinator's review of responses pursuant to the Agreement." *See Emory University Compliance Review* (Dec. 18, 2019), available at https://www2.ed.gov/about/offices/list/ocr/docs/investigations/more/ 04146001-a.pdf. This resolution agreement was meant to fix numerous inadequacies pointed out by the OCR, from inadequate reporting to incomplete files.

37.     The threat of revocation of federal funds—the ultimate penalty—was a powerful tool in motivating colleges to aggressively pursue and punish male students accused of sexual misconduct.  In that regard, Anne Neal, of the American Council of Trustees and Alumni, observed: "There is a certain hysteria in the air on this topic .... It's really a surreal situation, I think." *See* Tovia Smith, *How Campus Sexual Assaults Came to Command New Attention*, National Public Radio (Aug. 12, 2014), https://www.npr.org/2014/08/12/339822696/how-campus-sexual-assaults-came-to-command-new-attention. Neal explained that "schools are running so scared of violating the civil rights of alleged victims that they end up violating the due process rights of Defendant instead."

38.     Likewise, on September 1, 2014, the Chronicle of Higher Education noted that colleges were facing "increasing pressure from survivors and the federal government," including claims that college campuses had become "hazardous places" for female students.  *See* Robin Wilson, *Presumed Guilty: College Men Accused of Rape Say the Scales are Tipped Against Them*, Chronicle of Higher Education (Sept. 1, 2014), https://www.chronicle.com/article/Presumed-Guilty/148529. For example, the article noted that different standards were being applied to male students versus female students: "Under current interpretations of colleges' legal responsibilities, if a female student alleges sexual assault by a male student after heavy drinking, he may be suspended or expelled, even if she appeared to be a willing participant and never said no. That is because in heterosexual cases, colleges typically see the male student as the one physically able to initiate sex, and therefore responsible for gaining the woman's consent." *Id.*

39.     Notably, a recent study by the National Bureau of Economic Research found that opening more Title IX investigations benefits colleges in their application submission rates and has no negative impact on securing donations.  *See* Jason M. Lindo et al., *Any Press is Good Press? The Unanticipated Effect of Title IX Investigations on University Outcomes, National Bureau of Economic Research*, Working Paper No. 24852 (July 2018), http://www.nber.org/papers/w24852.

40.    The study found "no evidence [that] federal Title IX investigations reduce students' interest in a university.  Instead, [it found] evidence that these investigations increase freshman applications and enrollment, for both female and male students." *Id.*  The study further found that "[f]ederal Title IX investigations appear to have no effect on student retention, as the enrollment of continuing students is unaffected," and that "analysis of . . . data suggests that federal Title IX investigations have no detectable effects on donations." *Ibid*.  In other words, colleges and universities have everything to gain from aggressively pursuing Title IX cases, and nothing to lose.

41.    Colleges and universities, including Emory, were fearful of and concerned about being investigated or sanctioned by the DOE and/or of potential Title IX lawsuits by the DOJ. In response to pressure from OCR and DOJ, educational institutions, like Emory, have limited procedural protections afforded to males, like the Plaintiff, in sexual misconduct cases.

### B. The 2017 Revocation of the DCL and Emory's Refusal to Update its Policies Accordingly.

42.    On September 7, 2017, Department of Education Secretary Betsy DeVos vowed to replace the "failed system" of campus sexual assault enforcement to ensure fairness for both accusers and the accused, proclaiming that "one person

denied due process is one too many." Press Release, *Secretary DeVos Prepared Remarks on Title IX Enforcement* (Sept. 7, 2017), *available at* https://www.ed.gov/news/speeches/secretary-devos-prepared-remarks-title-ix-enforcement.

43.    DeVos explained, "[t]he truth is that the system established by the prior administration has failed too many students;" specifically, "[t]he notion that a school must diminish due process rights to better serve the 'victim' only creates more victims." *Id.*

44.    Acknowledging the massive pressure placed on universities and educational programs, by the DCL, DeVos stated, "[n]o school or university should deprive any student of his or her ability to pursue their education because the school fears shaming by – or loss of funding from – Washington." *Id.*

45.    With respect to the rights of the accused, DeVos declared, "[e]very student accused of sexual misconduct must know that guilt is not predetermined," and that "any school that uses a system biased toward finding a student responsible for sexual misconduct also commits discrimination." *Id.* She continued, "Due process is the foundation of any system of justice that seeks a fair outcome. Due process either protects everyone, or it protects no one." *Id.*

46.    On September 22, 2017, the OCR formally rescinded the DCL and the

April 2014 Q&A, and put in place interim guidance (the "2017 Q&A"), while the current administration reviewed and revised its practices regarding the adjudication of complaints of sexual misconduct on college campuses. *See* Dep't of Ed., Dear Colleague Letter (Sept. 22, 2017), https://www2.ed.gov/about/offices/list/ocr/letters/colleague-title-ix-201709.pdf; *see also* Dep't of Ed., *Q&A on Campus Sexual Misconduct* (Sept. 2017), https://www2.ed.gov/about/offices/list/ocr/docs/qa-title-ix-201709.pdf.

47.    In rescinding the 2011 DCL, the OCR noted that it had placed "improper pressure upon universities to adopt procedures that do not afford fundamental fairness," and "lack the most basic elements of fairness and due process, are overwhelmingly stacked against the accused, and *are in no way required by Title IX law or regulation*." Dep't of Ed., Dear Colleague Letter (Sept. 22, 2017), https://www2.ed.gov/about/offices/list/ocr/letters/colleague-title-ix-201709.pdf. (citations omitted) (emphasis added).

48.    In that regard, the 2017 Q&A prohibits universities from relying on fixed rules or assumptions that favor complainants over respondents.

49.    The 2017 Q&A cautions that "[t]raining materials or investigative techniques and approaches that apply sex stereotypes or generalizations may violate Title IX and should be avoided so that the investigation proceeds objectively and

impartially," and the same standard applies for "[d]ecision-making techniques or approaches." 2017 Q&A at 4, 5.

50.     The 2017 Q&A requires universities to "adopt and publish grievance procedures that provide for a prompt and equitable resolution of complaints of sex discrimination, including sexual misconduct." *Id*. at 3 (emphasis added). In that regard, the "elements in evaluating whether a school's grievance procedures are prompt and equitable[] includ[e] . . . ensur[ing] an *adequate, reliable, and impartial* investigation of complaints." *Ibid*. (emphasis added).

51.     The 2017 Q&A also requires investigators to "synthesize *all available evidence*— including both inculpatory and exculpatory evidence—and take into account the unique and complex circumstances of each case." *Id.* at 4 (emphasis added).

52.     The 2017 Q&A also requires that "[a]ny rights or opportunities that a school makes available to one party during the investigation should be made available to the other party on equal terms." *Id.* at 4.

53.     Likewise, the 2017 Q&A, in a significant departure from the DCL, states: "The findings of fact and conclusions should be reached by applying either a preponderance of the evidence standard or a clear and convincing evidence standard," as long as the standard for evaluating claims of sexual misconduct is the

same as that applied in other student disciplinary proceedings. *Id*. at 4; *see also id*. footnote 19 at 4.

54.     The 2017 Q&A suggests that the policies and procedures in place at Emory at all times relevant to this lawsuit—which were tailored in such a way as to comply with the DCL under the threat of loss of federal funding—were unfair and, ultimately, contrary to the goal of gender equality in Title IX proceedings.

55.     Despite the sweeping changes caused by the rescission of the 2011 DCL and the implementation of the 2017 Q&A, Emory stated that it would not change its policies and procedures. *See* Presley West, *Emory Follows Obama-era Title IX Policies, Reviews Interim Guidelines,* The Emory Wheel (Oct. 3, 2017), available at https://emorywheel.com/emory-follows-obama-era-title-ix-policies-reviews-interim-guidelines/.

56.     On November 16, 2018, the Department of Education released proposed Title IX regulations, subject to "notice-and-comment rulemaking." https://www.ed.gov/news/press-releases/secretary-devos-proposed-title-ix-rule-provides-clarity-schools-support-survivors-and-due-process-rights-all.

57.     Despite a different direction announced by the Trump Administration, colleges, universities, and educational programs including Emory have mostly continued with victim-centered practices and policies in place during the Obama

Administration, holding on, as a matter of ideological commitment, to what is a gender biased enforcement of Title IX.

58.     In January 2020, NASPA, the national organization of Student Affairs Administrators in Higher Education, which has 15,000 members representing more than 1500 institutions, issued a study, "*Expanding The Frame: Institutional Responses to Students Accused of Sexual Misconduct.*" (available at https://www.naspa.org/report/expanding-the-frame-institutional-responses-to-students-accused-of-sexual-misconduct) The study, intended to refute "the common narrative that institutions are not concerned with responding parties' rights in sexual misconduct cases," essentially evidenced to the contrary that widespread institutional bias against the accused starts at the very inception of a complaint, prior to any investigation or adjudication.

59.     In a process governed by the enforcement of Title IX gender equality, and in which the overwhelming majority of accused students are male, the survey reported that only 5% of schools have even one full-time employee to assist accused students; 85% have no budget dedicated specifically to providing services for accused students; and for accused students "no established best practices currently exist, and most institutions are only just developing these programs, identifying what specific services are needed, and exploring what is equitable or equal."   While

alleged victims have entire departments of advocates funded by the institution dedicated to their needs, only 13% of colleges and universities have a staff member reach out "directly to responding parties about support services available."  The study suggests that accused students are left to defend themselves by administrators "due to perceived pushback from members of the campus community who disagree with providing respondent services."

60.    On May 6, 2020, the Department of Education released new Title IX regulations, which amended the Code of Federal Regulations for Nondiscrimination on the Basis of Sex in Education for Programs or Activities Receiving Federal Financial Assistance (the "2020 Title IX Final Rule") which carry the force and effect of law as of August 14, 2020.  ("US Department of Education Releases Final Title IX Rule," available at https://www2.ed.gov/about/offices/list/ocr/ newsroom.html).

61.    The 2020 Title IX Final Rule replaced all previously issued OCR guidance, including the rescinded 2001 Title IX Revised Sexual Harassment Guidance.

62.    The 2020 Title IX Final Rule provides respondents with procedural rights which the Plaintiff was deprived of during his own disciplinary proceeding. (*See* "Summary of Major Provisions of the Department of Education's Title IX

Final Rule," available at https://www2.ed.gov/about/offices/list/ocr/docs/titleix-summary.pdf).

63.    In stark contrast to previous guidance, the 2020 Title IX Final Rule specifies that colleges are only required to pursue Title IX allegations that occur during an institution's education program or activity over which the institution exercised substantial control over both the respondent and the context in which the alleged sexual harassment occurred, leaving off-campus conduct beyond the scope of Title IX jurisdiction.

64.    Following the *Davis*[3] standard outlined by the Supreme Court, the 2020 Title IX Final Rule also narrows the definition of sexual harassment, now defined as unwelcome conduct, on the basis of sex, "determined by a reasonable person to be so severe, pervasive, *and* objectively offensive that it effectively denies a person equal access to the recipient's education program or activity," as opposed to the previous administrative guidance definition of "severe, pervasive, *or* objectively offensive." This standard was adopted to "ensure the imposition of consistent requirements in judicial and administrative contexts." *See* Defs' Opp. To Mot. For Prelim. Inj. 23, *Pennsylvania v. DeVos*, No. 1:20-CV-01468 (CJN), 2020 WL

---

[3] *Davis Next Friend LaShonda D. v. Monroe Cty. Bd. of Educ.*, 526 U.S. 629, 119 S. Ct. 1661, 143 L. Ed. 2d 839 (1999).

4673413 (D.D.C. Aug. 12, 2020).

65.    Further, the 2020 Title IX Final Rule permits universities to choose between the clear and convincing standard and the preponderance of the evidence standard when determining student and faculty responsibility.

66.    Under application of the new Title IX regulations, Plaintiff was deprived by Emory of numerous procedural rights. By way of example and not limitation, the 2020 Title IX Final Rule states that schools must:

   a.  Notify respondents that they are presumed innocent until a finding of responsibility is made;

   b.  Provide the accused with a hearing before any finding of responsibility is made or sanctions are imposed;

   c.  Provide the accused with the right to a live hearing with cross-examination of all witnesses. Such cross-examination must be done directly, orally, and in real time by the party's advisor of choice, who may be an attorney;

   d.  Objectively evaluate all relevant evidence, both inculpatory and exculpatory;

   e.  Avoid credibility determinations based on the status of a student as complainant or respondent;

    f.  Train school decision-makers and investigators on issues of relevance and bias;

    g.  Provide equal opportunities to the complainant and respondent to present facts;

    h.  In the event that a respondent is determined responsible for a policy violation, provide the respondent with a written notice of determination, including the rationale for the determination, and any disciplinary sanctions imposed.

67. On information and belief, Emory has acknowledged its procedural shortcomings in light of the new regulations as evidenced by its updating of the Policy as of August 13, 2020.

### C. Emory Faces Years of Complaints for Failure to Address Claims of Sexual Assault and Harassment Allegedly Committed by Male Students and/or Faculty.

68. Incredibly, student outrage over Emory's mishandling of complaints of sexual misconduct against male students and faculty dates back more than *30 years*. In 1991, 200 law students marched in protest of the University's lack of action taken regarding the complaints of 13 women that a male professor had tried to kiss them without consent, invited them on dates, and called them at their homes. *See Emory Move In Sex a Case Spurs Protest,* The New York Times (Mar. 20, 1991). The

students called on the University to suspend the professor after it took no action against the professor. *Id.*

69.    Even in more recent times, the University still appears to be coming under fire for its failure to adequately respond to allegations and has responded by targeting males as the perpetrators of sexual misconduct.

70.    Indeed, in 2013, the University Office of Respect hosted the inaugural RespectCon, which focused on sexual assault awareness. The University's news article about the event stated that one of the focuses of the event was "engaging *men* in sexual violence prevention." *See* Kimber Williams, *RespectCon 2013, Denim Day address sexual assault issues*, Emory News Center (Apr. 2, 2013) (emphasis added), available at https://news.emory.edu/stories/2013/04/er_respectcon_conference/campus.html.

71.    Emory's institutionalized bias against males was demonstrated yet again in 2014 by Emory's RealConsent program, which was a sexual assault educational program "for college males." *See Emory OTT*, Twitter (Jun. 6, 2014), available at https://twitter.com/EmoryOTT/status/474933767149068288.

72.    In 2018, Emory's bias resulted in legal troubles for the University when a male student sued Emory for holding "biased assumptions that female students would not make false accusations of sexual assault against their fellow male

students." *See* Julia Munslow and Michelle Lou, *Former Student Sues Emory, Citing Bias in Title IX Process*, The Emory Wheel (Mar. 7, 2018), available at https://emorywheel.com/27356-2/.

73.    Moreover, in 2019, Emory's Office of Respect hosted RespectCon19, which featured a talk from Men Stopping Violence about the "Definition of Male Sexual Violence against Women: Implications for Engaging Men on Campus" as well as a discussion called "Masculinity as a Failed Project."

74.    Unfortunately, Plaintiff's case demonstrates that Emory continues on a path of institutionalized bias against males accused of sexual assault, and accordingly Emory aggressively pursued baseless claims to fulfill its preconceived notions of Plaintiff's guilt.

## II.    EMORY PROSECUTES PLAINTIFF BASED ON ROE'S FALSE AND SHIFTING STORIES

### A. Plaintiff

75.    Plaintiff grew up in Chicago, Illinois and attended an inner-city high school after attending a religious grammar school. While in high school, Plaintiff participated in the IB program[4] and worked extremely hard on his studies in order to

---

[4] The IB program allows students to take college-level courses while in high school.

pursue his goals of attending college.

76.    Due to Plaintiff's strong academic record, he had numerous options when it came time to choose a college to attend. Plaintiff chose Emory due to its strong academics and extensive opportunities for career-building extra-curriculars.

77.    Plaintiff matriculated to Emory in the Fall of 2018 to pursue his undergraduate education as a religion and ethics major. Plaintiff excelled at Emory, performing admirably academically, excelling in Emory's highly competitive Goizueta business school, working as a Teaching Assistant, building strong relationships with his professor mentors, taking MBA classes ahead of schedule as an undergraduate, securing a lucrative job at an investment bank for after graduation and even forming a startup company with a recent valuation of $500,000.

78.    While at Emory, Plaintiff joined Greek life and served on Emory's Interfraternity Council as well as S.A.F.E. Greeks. Accordingly, in his role in S.A.F.E. Greeks, Plaintiff has spent much of his time at Emory educating other members of the Greek community about sexual assault awareness and prevention.

79.    In his time at Emory, Plaintiff enjoyed a stellar reputation, formed lifelong friendships and through hard work, dedication and savvy networking, developed an impressive array of connections, mentors and opportunities.

80.    Unfortunately, Plaintiff's persistent hard work and integrity are now at

risk due to Roe's false allegations and Emory's biased Title IX procedures that deprived him of a fair process.

**B. April 20, 2019**

81.     Plaintiff and Roe first met at a fraternity formal in or around the week of April 8, 2019 because Roe had gone to formal with one of Plaintiff's friends. Formal was a two-day event in a hotel, and the only time Plaintiff and Roe had any interaction was when a large group of people, including Plaintiff and Roe, had lunch together.

82.     The next time Plaintiff saw Roe was on April 20, 2020, when Plaintiff's fraternity hosted a daytime party at the Sigma Alpha Mu ("Sammy") fraternity house. The party was advertised as a "White Claw" party. It was raining on the day of the party, and so the guests of the party congregated inside the common areas of the house, including the residential hallways and bedrooms.

83.     Plaintiff was not smoking marijuana during the party, despite the fact that April 20th is a known holiday for those who smoke cannabis, due to the fact that his grandfather had recently fallen ill and therefore Plaintiff was not in the mood to. Plaintiff did smoke earlier in the morning, long before the party, and at no time denied smoking marijuana occasionally in general. However, Plaintiff did not smoke while he was with Roe. Additionally, Plaintiff did not drink alcohol because he was

taking Accutane at the time.

84.     At the party, Roe approached Plaintiff and flirted with him at her friend
ER's request because ER wanted to smoke at 4:20 p.m. Roe asked Plaintiff if she
and ER could smoke, and Plaintiff said "sure." Plaintiff, Roe, and Plaintiff's friend,
IK, walked to Plaintiff's room in the fraternity house, which was located on the first
floor of the house. Plaintiff, IK, and Roe were sober.

85.     In the room, Plaintiff played music on his speaker. Neither Plaintiff nor
IK could find marijuana to smoke at 4:20 p.m., but Plaintiff, IK, and Roe hung out
together in Plaintiff's room for a short while.

86.     IK then left the room to return to the party, and Plaintiff got up to go to
the bathroom, which was located in a corridor in Plaintiff's room. The door to
Plaintiff's room was unlocked the entire time and Roe voluntarily remained in
Plaintiff's room. When Plaintiff returned from the bathroom, Roe had moved from
the couch and was sitting on the edge of Plaintiff's bed.

87.     Plaintiff and Roe talked for a few minutes, and then Plaintiff moved to
sit on the bed next to her. Plaintiff and Roe continued talking. Roe then leaned in
and kissed Plaintiff, and Plaintiff reciprocated. Roe was clearly the more sexually
experienced party. Indeed, Plaintiff's only sexual encounter before Roe was in his
senior year of high school with his girlfriend of the time. Roe kissed Plaintiff

aggressively, making Plaintiff nervous.

88.    Plaintiff then stopped kissing Roe and went to his phone to change the song that was playing. Roe continued to stay in Plaintiff's room voluntarily when Plaintiff got up.

89.    When Plaintiff went to his phone, Roe mocked Plaintiff because he stopped kissing her. Plaintiff told Roe he was changing the song, and then Roe and Plaintiff continued to talk more. Plaintiff told Roe that he did not particularly like kissing, because he felt inexperienced and not good at it. Roe then stated, unprompted, "I'm really good at giving head!"

90.    Roe then on her own incentive proceeded to unbutton Plaintiff's pants. Plaintiff stood up so she could pull his boxers and pants down, and Roe proceeded to voluntarily give Plaintiff oral sex. Plaintiff did not enjoy Roe's oral sex, because he felt that it was excessive, as Roe was making noises while spitting on his genitals. Plaintiff, again feeling uncomfortable due to his inexperience, reached for his phone to change the song that was playing to create a break in the awkwardness of the encounter.

91.    Roe, annoyed, stood up and asked Plaintiff what was wrong, and Plaintiff pulled up his boxers and told her that nothing was wrong, but he would prefer to have sex, if Roe wanted to. Roe stated that she wanted to have sex and

began to take her shirt off.

92.    Plaintiff retrieved a condom from between the two twin mattresses that were pushed together and put the condom on. Roe then took her shorts off on her own, turned around, and declared "everyone loves me for my ass." Roe then took off her underwear, walked over to the bed, got on top of Plaintiff and they began to kiss.

93.    While they were kissing, Roe began to gyrate on Plaintiff, but there was no penetration. In general, Plaintiff was never fully aroused by Roe, as a result of her aggressive nature and his own lack of comfort due to his inexperience. Roe was far more experienced than Plaintiff, and, on information and belief, this dynamic irked Roe.

94.    Plaintiff got up and used the bathroom to break up the awkwardness of the encounter. There was never penetration during the sexual encounter. While Plaintiff was in the bathroom, Roe texted ER, saying "we're fucking oh no," but notably made *no mention of an assault.*

95.    When Plaintiff returned, he stated that he was curious what he was missing at the party, so he asked Roe if she wanted to go out to the party to see if it was "lit" yet. Roe said "sure," but seemed angered that Plaintiff did not want to continue a sexual encounter with her.

96.     Plaintiff and Roe then proceeded to get dressed, and Plaintiff's friend, JM, walked into the room because the door was unlocked and sat on the couch. Roe showed no signs of duress or intoxication.

97.     When JM left Plaintiff's room, Roe asked if Plaintiff wanted to go out to the party, and Plaintiff stated that he would go out later. Roe then left the room and went to the party. The entire interaction between Roe and Plaintiff lasted approximately 45 minutes.

98.     Roe immediately returned to party mode, showing no signs of distress. Roe danced, played beer pong, and flirted aggressively with other men at the party. Notably, *Roe also had intercourse with another student, JA, shortly after her encounter with Plaintiff.* On information and belief, Roe also alleged that her encounter with JA was not consensual.

99.     Later that day, Roe went to dinner with her friends, including JA, and appeared happy and controlled.

100.    On May 5, 2019, Plaintiff texted Roe to say hi. Roe read the text message on May 5, 2019, but did not respond. On August 15, 2019, *three and a half months later*, Roe responded to Plaintiff's text asking him never to speak to her again because the encounter was "not consensual." Clearly, at that point, Roe's message was premeditated to create a story to bring to the Title IX Office.

### C. The Aftermath of the Party and the Biased Investigation

101.   Despite the fact that Roe's encounter with Plaintiff was consensual, Roe regretted the admittedly awkward encounter and decided to file false allegations against Plaintiff in order to save face.

102.   On November 6, 2019, over six months after the consensual sexual encounter at the "White Claw" party, Roe decided to file a formal complaint with the Emory Title IX Office falsely alleging Nonconsensual Sexual Intercourse and Nonconsensual Sexual Contact by Plaintiff. Notably, Roe's complaint did not include intoxication as a reason for her lack of consent, but rather focused on an allegedly violent assault in which she incredibly alleged Plaintiff choked her with her own belt during sexual intercourse.

103.   On November 7, 2019, Title IX Coordinator, Judith Pannell, reached out to Plaintiff to notify him of the allegations. Notably, this notice made no mention of any claim of intoxication. Plaintiff, who was recently forced to wear casts on both arms for his broken wrists due to a cycling accident, sprinted to Pannell's office and cried out of fear at the mere nature of the allegations.

104.   On December 7, 2019, one month after being notified of the false allegations against him, Plaintiff had his initial interview with Title IX Investigator Laura Yearout. Notably, *Plaintiff did not receive Roe's initial statement before the*

*interview*. Accordingly, Plaintiff was unaware of the exact allegations against him and deprived of an opportunity to prepare an adequate defense.

105. Strangely, however, Roe did not partake in an initial interview until January 24, 2020, over one month after Plaintiff's initial interview. In this interview Roe reiterated the allegations as stated in her written statement that was initially submitted to the Title IX Office. Roe admitted that she did not write the written statement, but rather, Roe's friend wrote it for her. Notwithstanding, Roe refused to disclose the name of her "friend," so the Investigator could not question whether this written statement was accurate. However, the Investigator failed to consider this when making credibility determinations.

106. Incredibly, at this meeting, Roe added even more false allegations surrounding her encounter with Plaintiff. For example, Roe claimed that Plaintiff removed her pants himself, and that Plaintiff pinned her down and choked her with her belt. Roe claimed that her belt remained in her pant loops and that Plaintiff held both over her neck to choke her during the encounter. Roe also claimed that Plaintiff locked the door during the encounter, which was inherently false considering the fact that one of Plaintiff's friends was able to walk into the room without unlocking the door.

107. Roe also claimed that Plaintiff looked through a peephole in the door

to refuse entry to ER. However, photo evidence proved that no such peephole existed.

108.   Notably, Roe maintained that she did not feel intoxicated at all during the encounter. Roe claimed that around 2:30 p.m. she drank Mike's Hard Lemonade and a shot of alcohol, and nothing else. Roe stated that she was not incoherent, but instead was very aware.

109.   Yearout asked Roe numerous leading questions throughout this interview in order to paint Plaintiff in a negative light and convey a story which would lead to Plaintiff's finding of responsibility. By way of example and not limitation:

a.   When Roe described kissing Plaintiff, she stated she "just let it happen." Yearout followed this by asking, "he was kissing you and you were withdrawing away from him?";

b.   Regarding sexual intercourse, Roe responded only when asked leading questions such as "did [Plaintiff] penetrate you?" to which she answered "yes." Yearout then prompted Roe with "penis, fingers, or something else?" to which Roe responded "both of those."

110.   After Roe's initial interview, the investigation came to a standstill, with no updates or reasons for delay provided to Plaintiff. On March 13, 2020, in light of

the COVID-19 pandemic, Emory switched to remote instruction, and as a result, remote interviews for the Title IX investigation. As a result, the already delayed investigation slowed even further.

111.   On April 30, 2020, Investigator Kristyne Seidenberg took over the investigation on behalf of Yearout. Notably, there was no reasoning provided for this change.

112.   On May 11, 2020, Seidenberg interviewed Plaintiff and Roe via Zoom separately.

113.   After the May 11, 2020 interviews, the investigation consisted of written follow up questions submitted to the parties and witnesses. *No witnesses were interviewed via zoom or in person*, instead, all questions were submitted in a written questionnaire form via email. Critically, the Investigator did not make credibility assessments of the numerous witnesses contacted throughout the next five months.

114.   Notably, the Investigator asked Roe and her witnesses questions about both of her complaints against Plaintiff and JA due to the fact that the allegations stemmed from nearly the same set of events. However, the Investigator precluded Plaintiff from obtaining any information surrounding the questions asked about the JA complaint. As a result, the only party that did not have the full scope of the

allegations and relevant evidence was Plaintiff. While the Title IX Office alleged that this information was protected by FERPA, the fact that the same investigator served on both cases, and thus obtained all relevant information surrounding the party, meant that the Investigator considered evidence which was not released to Plaintiff in making her decision.

115.   On June 2, 2020, Roe responded to the Investigator's written questions, and shifted her story yet again. For example, Roe now claimed, despite her previous claims that she was not intoxicated, that she was *showing signs of intoxication*, including slurred speech, and claimed that Plaintiff *knew* that she was drunk.

116.   On August 14, 2020, while the investigation was ongoing, the new federally mandated Title IX regulations were imposed, requiring Emory to revise its Title IX Policy to provide respondents with numerous procedural protections, such as the right to a live hearing and the right to have a representative cross-examine complainants and witnesses directly. However, despite the fact that the University had new policies in place, Emory decided to maintain parallel policies and continue to investigate and adjudicate Roe's complaint against Plaintiff under the old Title IX Policy in order to deprive Plaintiff of the procedural protections that he would have been granted had the new regulations been implemented.

117.   On September 8, 2020, Siedenburg submitted additional written

questions for clarification to Roe. In her responses, Roe now claimed that *her pants and belt were on the floor during the encounter*, despite her previous claims that Plaintiff choked her with her belt.

118.    On October 19, 2020, Siedenburg issued the investigation report, which contained irrelevant, clearly prejudicial information submitted by Roe and her witnesses. For example, the report called Plaintiff the "biggest stoner at Emory" and contained Roe's false, unsubstantiated statements that a lot of girls are "scared" of Plaintiff. Notably, none of these claims were relevant to the question of whether Roe consented to the encounter, but rather merely served to taint the fact finder reading the report.

119.    On November 4, 2020, Plaintiff submitted a 25-page response to the investigation report, which outlined numerous factual inaccuracies within the complaint stemming from Roe's false allegations and pointed out the shifting stories that Roe had told in her interviews, thereby drawing credibility concerns. However, none of these concerns were addressed or even acknowledged by the Investigator. Rather, Roe's statements continued to be taken and trusted at face value, despite her own contradictions.

120.    On November 12, 2020, over *one year* after initially becoming aware of Roe's allegations, Plaintiff was issued a notice of the charges against him. The

notice stated that the findings in the biased and flawed investigation report, which was clearly created to prejudice Plaintiff, supported charging Plaintiff with Nonconsensual Sexual Intercourse and Nonconsensual Sexual Contact. However, this notice only contained bare assertions of policy violations and made no mention of the specific allegations. Moreover, this notice made no mention of an intoxication claim.

121.   On December 16, 2020, Plaintiff received notice of the hearing, which was to be held on February 16, 2021. The University made clear that the new regulations would not be implemented for this hearing and that instead, the University would continue to enforce its old Title IX Policy.

122.   Plaintiff's advisers subsequently complained and objected to Emory's refusal to utilize the policies and procedures in accordance with its August 14, 2020 Title IX regulations. However, Emory brushed the objections to the side.

123.   On February 16, 2021, over multiple vehement objections by Plaintiff's advisers, Emory proceeded forward with a hearing absent the procedural protections granted by the August 2020 Title IX regulations, which had been in practice at Emory for over six months. As a result, Plaintiff was not permitted to have a representative cross-examine Roe, which was crucial for credibility determinations, given that the complaint was based on "he said she said" allegations.

124.   The hearing was, unfortunately, infected with the same bias and female complainant favoritism as the investigation. Roe was permitted to have three advisers with her and was permitted to speak directly to Plaintiff in her opening, while Plaintiff was not allowed the same.

125.   Throughout the hearing, Roe received the lightest of trauma-informed questions from a warm panel that did not question her credibility in a genuine or meaningful manner, despite the fact that Roe admitted that she *lied* in her previous statements to the Investigator. For example, at the hearing, Roe for the first time claimed that she was *severely intoxicated* for the entire day leading up to and after her encounter with Plaintiff, and that she *lied to the Investigator in her interviews regarding her level of intoxication because she wanted her claims to be believed.* Moreover, when asked about her claims that Plaintiff choked her with her belt, Roe walked back her statement and stated that the choking claims were *misleading*.

126.   Despite Roe's admitted lies, the panel remained unconcerned about Roe's credibility and failed to ask questions bearing negatively on her credibility. Indeed, the panel refused, without explanation, to ask certain, clearly relevant, questions of Roe or her witnesses submitted by Plaintiff. Such a refusal to ask relevant questions would have been in violation of the August 2020 Title IX regulations that the University refused to apply.

127.   For example, the panel refused to ask questions regarding whether Roe was "giggling" or her state after the encounter, both at the party and at dinner, but permitted Roe's witness ER, who was only present at dinner, to describe Roe's state of intoxication, hours later.

128.   Plaintiff, on the other hand, received a much more hostile and adversarial line of questioning. Plaintiff was asked far more difficult, probing questions in an effort to impeach his credibility.

129.   Notably, the Chair of the panel, Dr. Ely, after warmly stating that Roe would testify first, changed his tone and stated the Plaintiff would then testify as to "what he thinks went on," revealing that Plaintiff was presumed as guilty, and that his credibility and defense were treated as suspicious.

130.   Unsurprisingly, the panel's biased techniques led to a finding of responsibility for Plaintiff. On March 2, 2021, the Panel issued a notice to Plaintiff stating that they found him responsible for Nonconsensual Sexual Intercourse and Nonconsensual Sexual Contact. The panel's determination lacked sufficient detail or reasoning, and merely concluded, based upon Roe's lies and unsubstantiated statements, that Plaintiff was less credible than Roe. Plaintiff was sanctioned to a one semester suspension. However, given that the courses Plaintiff needs in order to complete his degree are only offered in the spring, the sanction is effectively a one-

year suspension.

131.    The only attack on credibility in the finding was lodged at Plaintiff. The panel claimed that it did not believe that Plaintiff did not smoke marijuana while at the "4/20 party," a fact that was irrelevant to the issue of consent. However, the panel claimed that because they believed that Plaintiff lied about not smoking, that he was lying in the rest of his statements.

132.    Notably, the same reasoning was not used in assessing Roe's credibility, *despite the fact that Roe admitted to lying about material facts pertaining to her allegations*. Indeed, in the section listing major discrepancies in the investigation report and the statements at the hearing, the panel wrote "none noted."

133.    Moreover, the Panel failed to find a single credibility concern for Roe and even noted, as fact, that Roe drank approximately five drinks and was noted by witnesses to be drunk and impaired, even though Roe had claimed prior to the hearing, "I was not incoherent—very aware." Clearly, Roe's two female witnesses that testified that Roe was intoxicated were given more credibility than the three male witnesses called by Plaintiff that testified that Roe was not intoxicated.

134.    Plaintiff timely appealed the finding on March 22, 2021. Plaintiff pointed out the numerous procedural errors and bias encountered throughout the investigation and adjudication of Roe's complaint against Plaintiff.

135. The University subsequently denied Plaintiff's appeal and rubberstamped the findings of the panel as well as the sanction.

2. Plaintiff has thus exhausted all administrative remedies and this complaint represents Plaintiff's final attempt to obtain relief from Emory's unjust findings.

## III.  **AGREEMENTS, REPRESENTATIONS, COVENANTS & WARRANTIES BETWEEN PLAINTIFF AND DEFENDANT EMORY UNIVERSITY**

136. Upon Plaintiff's matriculation to Emory, Plaintiff and Emory became mutually bound by the "Policy 8.2: Sexual Misconduct" document ("the Policy"), which is the applicable policy for Emory's Title IX procedures.

137. On information and belief, the Policy is updated and/or revised each new school year.

138. On information and belief, the Policy and/or the various provisions contained therein are available online through the Emory University website.

139. In response to the local and federal pressure for failing to protect female accusers or take a strong stance against sexual assault against males, Emory applied the Policy in a manner that, on information and belief, resulted in harsher penalties

for males accused of sexual misconduct as compared to females.[5]

140.   The Policy contains and represents a contract between students and the University and, in particular, between Plaintiff John Doe and Defendant Emory.

141.   Throughout the Title IX process in this case, Defendant breached its contractual obligations and the implied covenant of good faith and fair dealing by failing to abide by the Policy and the processes set forth therein, and by permitting gender bias to infect and taint the proceedings, resulting in an erroneous outcome.

142.   The Policy states, "The Title IX Coordinator for Students will ensure prompt, fair, and impartial investigations and resolutions of complaints alleging violations of this Policy."

> a. The University breached the Policy by failing to provide a fair and impartial investigation from the start. Instead, the Investigator conflated the two investigations when speaking with witnesses, which was clearly prejudicial and tainted witness testimony. Additionally, the Investigator failed to provide Plaintiff with information regarding Roe's second complaint which was clearly in

---

[5] Emory has not published statistics concerning the outcomes of sexual misconduct proceedings, including the gender of respondents who were sanctioned as a result thereof. This is information that Plaintiff intends to seek in discovery.

the possession of Roe and her witnesses. By not providing Plaintiff

with proper information regarding the complaints against him, the

University clearly breached any notions of basic fairness.

143.   According to the Policy, "Emory will endeavor to complete the

investigation and resolution of a complaint in a prompt and timely manner; the Title

IX Coordinator for Students will keep the parties apprised of the status of their case

on a periodic basis.

    a.   Emory failed to complete the investigation in a prompt and timely

manner. Rather, the University took nearly *one year* to investigate

and adjudicate Roe's complaint against Plaintiff, thereby

prejudicing Plaintiff by causing harm to his ability to focus on his

studies. Additionally, this delay was given no explanation, but

rather, Plaintiff was kept in the dark for much of the process.

144.   The Policy also states that "The procedures for institutional disciplinary

action will be conducted by Emory faculty, staff and graduate/professional students

who receive annual training on this Policy and the skills necessary to complete their

roles in the Title IX process."

    a.   The University breached this provision by appointing Investigators

and hearing officers that were clearly not trained properly.[6] The Investigator repeatedly throughout the investigation failed to properly follow up with Roe regarding her shifting story and allowed Roe to explain away her inconsistencies. For example, the Investigator asked Roe many leading questions, prodding Roe and suggesting answers to her that would fit the narrative to find Plaintiff responsible.

145.   According to the Policy, "If the Title IX Coordinator for Students determines that there is sufficient information that a Respondent may have committed a violation (or violations) of this Policy, then within 7 business days after the Report of Investigation is completed or supplemented, a written "Notice of Charges of Policy Violation" ("Notice of Charges") will be provided to the Respondent and the Complainant with summary information that supports the charge(s)."

a.   The University breached this Policy because the Notice of Allegations issued on November 7, 2019 failed to make any mention of incapacitation, which was the main theory of the finding of

---

[6] The Title IX Final Rule requires institutions to make available on their websites the training used. Emory does not provide access to this information.

responsibility. Moreover, the notice of allegations stated that Plaintiff choked Roe with her belt, which was not what Roe later described at the hearing. The University therefore failed to provide Plaintiff with an accurate and complete summary of information that supported the charges.

146.   The Policy mandates that "all parties involved receive appropriate support and fair treatment, and that allegations of sexual misconduct are handled in a prompt, thorough and equitable manner."

    a.   The University breached the Policy by failing to grant Plaintiff fair and equal treatment during the hearing. The hearing panel asked fewer questions of Roe and her witnesses than they asked of Plaintiff, and the questions that they did ask were less pointed and skeptical than those that were asked of Plaintiff. Furthermore, the University refused to apply the new Title IX regulations to the hearing which would have allowed for crucial cross-examination, despite the fact that the new regulations were already in place and being applied to other matters at the time of Plaintiff's hearing.

147.   The Policy states that the hearing "shall be non-adversarial in nature. The chair of the hearing board is empowered to take such steps as may be necessary

to preserve the non-adversarial character of the hearing."

    a. The University breached the Policy because Emory's administration, including Dr. Ely, created an environment which was clearly adversarial, as depicted by Dr. Ely's statement that Plaintiff would describe "what he thinks went on," discrediting Plaintiff's story from the beginning. Importantly, this phrasing was not used when referring to the Complainant or her witnesses' recollection.

148. According to the Policy, "Depending on the degree of intoxication, someone who is under the influence of alcohol, drugs, or other intoxicants may be incapacitated and therefore unable to provide affirmative consent."

    a. The University breached the Policy because the hearing panel failed to properly apply Policy definitions to Plaintiff's finding of responsibility. The panel found it more likely than not that Roe was unable to give *informed consent* due to *intoxication*. Importantly, neither informed consent nor intoxication are bases for finding responsibility. Rather, one's intoxication must *rise* to the level of incapacitation so as to make one incapable of giving *affirmative* consent, which was clearly not the case for Roe.

IV.   **PLAINTIFF'S DAMAGES**

149.   As a direct and proximate result of Defendant's biased, illegal, and improper conduct, an erroneous finding that Plaintiff engaged in Nonconsensual Sexual Intercourse and Nonconsensual Sexual Contact and the resulting sanction have been made a part of Plaintiff's educational records. The records may be released to educational institutions and employers to whom Plaintiff applies, substantially limiting his ability to gain acceptance to another school, or to secure future employment. Roe's allegations painted Plaintiff as a dangerous sex criminal, wiping out a lifetime of hard work towards his college education and future career prospects.

150.   Indeed, Plaintiff secured employment for after graduation, but said lucrative job was contingent on Plaintiff's successful completion of his undergraduate degree at Emory in May 2021. By improperly suspending Plaintiff and subjecting him to what is effectively a one-year suspension, Plaintiff lost the lucrative position he worked hard to secure, costing him a six-figure position after graduation. Further, he will likely be unable to obtain employment from that employer, or other similar employers in the industry, in the future, given the competitive nature of the particular employment. Therefore, Plaintiff's future career has been derailed and Emory's improper suspension will affect Plaintiff's livelihood

for the rest of his life.  As Emory was aware that Plaintiff's failure to graduate in May 2021 would result in loss of said position, Plaintiff is entitled to remote damages as described further below.

151.   Moreover, in the wake of the powerful #MeToo movement, schools and employers will not be clamoring to hire or admit someone who has been found responsible for sexual assault.

152.   Due to Defendant's biased, illegal, and improper conduct, Plaintiff was subjected to an unfair, biased, and improper investigation and adjudication process which destroyed his reputation and will permanently impact his future education and career prospects.

153.   Due to Defendant's biased, illegal, and improper conduct, Plaintiff was treated as a perpetrator and presumed guilty from the start.

154.   Due to Defendant's biased, illegal, and improper conduct, Plaintiff has been falsely labeled as a perpetrator of sexual misconduct.

155.   Due to Defendant's biased, illegal, and improper conduct, Plaintiff's educational files are now marred by a false and baseless finding of sexual misconduct.

156.   Due to Defendant's biased, illegal, and improper conduct, Plaintiff has suffered and will continue to suffer ridicule, reputational damage, economic losses,

and damages to his future educational and career prospects.

## AS AND FOR A FIRST CAUSE OF ACTION
### Violation of Title IX of the Education Amendments of 1972
### Erroneous Outcome

157.   Plaintiff John Doe repeats and realleges each and every allegation hereinabove as if fully set forth herein.

158.   Title IX of the Education Amendments of 1972 provides, in relevant part: "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a).

159.   Title IX of the Education Amendments of 1972 applies to all public and private educational institutions that receive federal funding, including Defendant Emory.

160.   On information and belief, Emory receives federal funding, including in the form of federal student loans given to students and is subject to the provisions of Title IX.

161.   Title IX is enforceable through a private right of action.

162.   Both the Department of Education and the Department of Justice have promulgated regulations under Title IX that require a school to "adopt and publish

grievance procedures providing for the prompt and equitable resolution of student…complaints alleging any action which would be prohibited by" Title IX or regulations thereunder. 34 C.F.R. § 106.8(b) (2018); 28 C.F.R. § 54.135(b) (2018).

163.   Under the 2001 Title IX Guidance, which was relied upon by Emory officials at the time of their decision finding Plaintiff responsible, the "prompt and equitable" procedures that a school must implement include, at a minimum: "[n]otice . . . of the procedure, including where complaints may be filed; [a]pplication of the procedure to complaints alleging harassment; . . . [a]dequate, reliable, and impartial investigation of complaints, including the opportunity to present witnesses and other evidence; . . . [and] [d]esignated and reasonably prompt timeframes for the major stages of the complaint process."  Dep't of Ed., *Office for Civ. Rights, Revised Sexual Harassment Guidance: Harassment of Students by School Employees, Other Students, or Third Parties -- Title IX* (Jan. 19, 2001), at 20.

164.   According to the 2001 Guidance, the procedures adopted by a school covered by Title IX must accord "due process to both parties involved."  *Id.* at 22.

165.   According to the 2001 Guidance, schools are obligated under Title IX to make sure that all employees involved in the conduct of the procedures have "adequate training as to what conduct constitutes sexual harassment, which includes 'alleged sexual assaults.'"  *Id.* at 21.

166. Title IX may be violated by a school's imposition of university discipline where gender is a motivating factor in the decision to discipline.

167. Emory engaged in gender bias in its Title IX proceedings. Plaintiff was innocent and wrongly found to have committed a violation of Emory's policies, and gender bias was a motivating factor.

168. Emory failed to conduct an adequate, reliable, and impartial investigation of Roe's complaint because, by way of example and not limitation:

    a. The Investigator failed to ask Roe questions that would negatively impact her credibility, and instead took Roe's statements at face value;

    b. The Investigator was not impartial, as she was assigned to both of Roe's complaints of sexual assault from the same day and therefore considered information outside the scope of the investigation in making her determinations;

    c. The Investigator failed to investigate the changing and exaggerated claims made by Roe, even after her story shifted throughout the investigation, and rather allowed Roe to explain away her inconsistencies as a result of "trauma";

    d. The University refused to apply the August 2020 Title IX

regulations, which would have afforded Plaintiff numerous procedural rights, and instead chose to maintain parallel policies for the sole purpose of depriving Plaintiff of his rights;

e. As a result of the University's failure to apply the August 2020 Title IX regulations, Plaintiff was precluded from cross-examining Roe, which was crucial to allow the panel members to assess credibility given the "he said she said" nature of the allegations;

f. When Plaintiff did submit questions to the Chair to be asked of Roe at the hearing, the panel failed to ask questions that could impact Roe's credibility;

g. The University failed to properly apply the preponderance of the evidence standard;

h. The "rationale" for finding Plaintiff responsible was not substantiated by facts or evidence, but rather relied on Roe's statements taken at face value; and

i. Plaintiff was presumed guilty from the start as a male accused.

169. Particular circumstances suggest that gender bias was a motivating factor behind the flawed proceedings, erroneous findings and the decision to impose an unduly harsh sanction upon Plaintiff. These circumstances include, by way of

example and not limitation:

    a.   The pressure imposed by the 2014 OCR resolution, including the fear of loss of federal funds as well as the fear of added financial liability such as reimbursing tuition for aggrieved students if the University was not compliant;

    b.   Emory's clear preconceived notions that men are perpetrators of sexual assault, as evidenced by its sexual assault training for males;

    c.   Internal pressure from the student body and/or media after years of criticizing Emory for its alleged failure to sufficiently prosecute and punish male students and/or faculty accused of sexual misconduct, including conducting dating back to 1991;

    d.   Emory's refusal to conduct any genuine investigation that could reveal exculpatory evidence, for example, failing to question Roe regarding her admitted lies at the hearing;

    e.   Defendant's distortion of the evidence to fit Roe's nebulous, false narrative, rather than impartially evaluating the facts of the case;

    f.   Defendant's finding that Plaintiff's alleged untruthfulness about smoking, a fact irrelevant to the issue of consent, negatively impacted his credibility, while finding that Roe's lies about

intoxication and choking did not negatively impact her credibility;

g. Finding that Roe's intoxication was a "fact" supported by evidence, where two of Roe's female witnesses testified to her intoxication, while ignoring the three male witnesses that testified that Roe was not intoxicated at all;

h. Defendant's failure to afford Plaintiff the presumption of innocence, as evidenced by the panel's statement that Plaintiff would testify as to what he "thinks" happened;

i. Defendant's failure to properly apply the preponderance of the evidence standard; and

j. Defendant's refusal to apply the particular facts of the case in considering the appropriate sanction, including the fact that Plaintiff had no prior disciplinary record and that his "one semester" suspension would, effectively, be a one year suspension.

170.   On information and belief, Emory's mishandling of Roe's complaint was informed by internal institutional pressure, ongoing OCR investigations into noncompliant universities, and the threat of recission of federal funds.

171.   On information and belief, Emory has engaged in a pattern of unfair investigations and adjudications resulting in serious sanctions being imposed on

male students, while not making comparable efforts with respect to allegations of sexual violence and abusive conduct made against non-male students.

172.   Based on the foregoing, Plaintiff was subjected to a biased, prejudiced, and explicitly unfair process in violation of Title IX.

173.   This unlawful discrimination in violation of Title IX caused Plaintiff to sustain substantial injury, damage, and loss, including but not limited to, loss of future educational and career opportunities, reputational damages, economic injuries, and other direct and consequential damages.

174.   As a result, Plaintiff is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements, as well as injunctive relief directing Emory to: (i) reverse the outcome and findings regarding Jane Roe's complaint; (ii) expunge Plaintiff's disciplinary record; (iii) remove any record of the original finding and sanction from Plaintiff's educational file(s); and (iv) issue an update/correction to any third parties to whom Plaintiff's disciplinary record may have been disclosed.

## AS AND FOR A SECOND CAUSE OF ACTION
### Breach of Contract

175.   Plaintiff John Doe repeats and realleges each and every allegation hereinabove as if fully set forth herein.

176.   At all times relevant hereto, a contractual relationship existed between Plaintiff and Emory through Emory's dissemination of the policies and procedures governing the student disciplinary system, including but not limited to the Policy, and Plaintiff's tuition payments and other considerations, such as compliance with the University's relevant policies.

177.   Emory committed numerous breaches of its agreements with Plaintiff during the investigation and adjudication of Jane Roe's allegations against him, including but not limited to:

     a.  Failing to ensure a fair and impartial investigation, and rather failing to conduct a genuine investigation into Roe's shifting story;

     b.  Failing to ensure a fair investigation by conflating Roe's two complaints, thereby confusing witnesses and prejudicing Plaintiff;

     c.  Failing to conduct an impartial investigation because the Investigator was assigned to both of Roe's complaints and therefore obtained information which biased her against Plaintiff from the start;

     d.  Failing to complete the investigation in a timely manner;

     e.  Failing to properly train the Investigator and the Panel members to investigate and adjudicate Roe's complaints adequately;

    f.   Failing to adequately apprise Plaintiff of the allegations against him, as the notice of charges made no mention of the claim of incapacitation and provided no details of the allegations;

    g.   Failing to ensure fair treatment of Plaintiff at the hearing, as Plaintiff asked fewer questions of Roe and avoided any questions that could negatively impact her credibility, while probing Plaintiff with skeptical questions;

    h.   Failing to ensure fair treatment of Plaintiff by refusing to apply the already in place August 2020 Title IX regulations at the hearing;

    i.   Failing to provide a hearing that was non-adversarial in nature, and instead treating Plaintiff as a perpetrator who would only describe "what he *thinks* went on";

    j.   Failing to properly apply the policy definition of informed consent and intoxication, where the facts of the case clearly did not support such a finding.

178.   As a result of the direct, proximate, and foreseeable consequence of the foregoing breaches, Plaintiff sustained tremendous damages including loss of educational and career opportunities, reputational damages, economic injuries and other direct and consequential damages.

179.   Thus, Plaintiff is entitled to damages in an amount to be determined at trial, plus punitive damages, prejudgment interest, attorneys' fees, expenses, costs and disbursements.

180.   Plaintiff is also entitled to attorneys' fees and expenses of this litigation under O.C.G.A. § 13-6-11, for Defendant's having acted in bad faith, being stubbornly litigious, and having caused Plaintiff unnecessary trouble and expense.

<div align="center">

**AS AND FOR A THIRD CAUSE OF ACTION**
**Intentional and Knowing Breach of Contract under O.C.G.A. § 51-12-10**

</div>

181.   Plaintiff John Doe repeats and realleges each and every allegation hereinabove as if fully set forth herein.

182.   At all times relevant hereto, a contractual relationship existed between Plaintiff and Emory through Emory's dissemination of the policies and procedures governing the student disciplinary system, including but not limited to the Policy, and Plaintiff's tuition payments and other considerations, such as compliance with the University's relevant policies.

183.   Emory committed numerous breaches of its agreements with Plaintiff during the investigation and adjudication of Jane Roe's allegations against him, as outlined in Paragraph 161 above.

184.   Emory was further made aware that, as a result of the aforementioned

breach of contract and the erroneous responsibility finding resulting from Emory's violation of Title IX that Plaintiff would lose the aforementioned, lucrative post-graduate job as a result of his failure to graduate in May 2021.

185.   With full knowledge of the job's graduation requirement, and the anticipated loss of said job, Emory still prevented Plaintiff from graduating in May 2021, and knowingly breached the university's contract with Plaintiff, depriving Plaintiff of his diploma and the lucrative, post-graduate job.

186.   As a result of the direct, proximate, and foreseeable consequence of the foregoing breaches, Plaintiff sustained tremendous damages including loss of educational and career opportunities, reputational damages, economic injuries and other direct and consequential damages.

187.   Thus, Plaintiff is entitled to damages in an amount to be determined at trial, plus punitive damages, prejudgment interest, attorneys' fees, expenses, costs and disbursements.

188.   Further, under O.C.G.A. § 51-12-10, Plaintiff is entitled to **remote** damages, both the salary lost from the lucrative post-graduate job he lost as a result of not graduating in May 2021 and the damages incurred by similar lost job opportunities in the future.

## **PRAYER FOR RELIEF**

**WHEREFORE**, for the foregoing reasons, Plaintiff demands judgment against Defendant as follows:

(i)     On the first cause of action for Violation of Title IX of the Education Amendments of 1972 Erroneous Outcome, a judgment against Emory awarding Plaintiff damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements, as well as injunctive relief directing Emory to: (i) reverse the outcome and findings regarding Jane Roe's complaint; (ii) expunge Plaintiff's disciplinary record; (iii) remove any record of the original Finding and Sanction from Plaintiff's educational file(s); (iv) issue an update/correction to any third parties to whom Plaintiff's disciplinary record may have been disclosed;

(ii)    On the second cause of action for Breach of Contract, a judgment against Emory awarding Plaintiff damages in an amount to be determined at trial, plus punitive damages, prejudgment interest, attorneys' fees, expenses, costs and disbursements;

(iii)    On the third cause of action for Intentional and Knowing Breach of

Contract, a judgment against Emory awarding Plaintiff damages in an

amount to be determined at trial, including *remote damages*, plus

punitive damages, prejudgment interest, attorneys' fees, expenses,

costs and disbursements; and

(iv)    Such other and further relief as the Court deems just and proper.

## **JURY DEMAND**

Plaintiff demands a trial by jury of all issues so triable.

Respectfully submitted this 9th day of July 2021.

|  |  |
|---|---|
| | */s/ Andrew Y. Coffman*_____ |
| | Andrew Y. Coffman, Esq. |
| **PARKS, CHESIN, & WALBERT, P.C.** | Georgia Bar No. 173115 |
| 75 14th Street, 26th Floor | acoffman@pcwlawfirm.com |
| Atlanta, GA 30307 | |
| Telephone: 404-873-8000 | |
| Facsimile:  404-873-8050 | |
| | |
| | */s/ Andrew Miltenberg*_____ |
| | Andrew Miltenberg, Esq. *(PHV admission pending)* |
| | New York Bar No. 4684627 |
| **NESENOFF & MILTENBERG, LLP** | amiltenberg@nmllplaw.com |
| 363 Seventh Avenue, 5th Floor | Nicholas Lewis, Esq. (*PHV admission pending*) |
| New York, NY 10001 | New York Bar No. 2399582 |
| Telephone: 212-736-4500 | nlewis@nmllplaw.com |
| Facsimile:  212-736-2260 | Stuart Berstein, Esq. *(PHV admission pending)* |
| | New York Bar No. 2371953 |
| *Counsel for Plaintiff John Doe* | SBernstein@nmllplaw.com |