# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
### ATLANTA DIVISION

JOHN DOE,

      Plaintiff,

v.

EMORY UNIVERSITY,

      Defendant.

CIVIL ACTION FILE

NO. 1:21-CV-2763-MHC

## <u>ORDER</u>

Plaintiff John Doe ("Doe") has filed a Complaint against Defendant Emory University ("Emory") alleging a violation of Title IX of the Education Amendments of 1972, 20 U.S.C. §§ 1681-1688, as well as breach of contract claims, arising out of Emory's investigation and adjudication of sexual misconduct allegations made against Doe by another student, Jane Roe ("Roe").  Compl. [Doc. 1] ¶¶ 157-88.  Doe was enrolled as a full time, tuition-paying, undergraduate student at Emory at all relevant times.  <u>Id.</u> ¶ 13.  Before the Court is Emory's Motion to Dismiss [Doc. 15].

# I.     BACKGROUND[1]

## A.     The Events of April 20, 2019

On April 20, 2019, Roe attended a daytime fraternity party at Doe's

fraternity, Sigma Alpha Mu.  Id. ¶ 82.  According to Doe, April 20 is a "known

holiday for those who smoke cannabis."  Id. ¶ 83.  Roe approached Doe and asked

him if she and her friend could smoke, to which Doe answered, "sure."  Id. ¶ 84.

Roe, Doe, and Doe's friend, IK, then walked to Doe's room in the fraternity house.

Id.  IK then left the room and returned to the party, but Roe remained in the room

while Doe used the restroom.  Id. ¶ 86.  When Doe returned from the restroom,

Roe had moved from the couch to the bed.  Id.  Doe and Roe talked for a few

minutes, then Roe leaned in for a kiss and Doe reciprocated.  Id. ¶ 87.  Roe

indicated that she was adept at performing oral sex and then unbuttoned Doe's

pants, after which Doe stood up so Roe could pull his boxers and pants down.  Id.

¶¶ 88-90.  According to Doe, "Roe proceeded to voluntarily give [Doe] oral sex."

Id. ¶ 90.

---

[1] Because this case is before the Court on a motion to dismiss, the facts are
presented as alleged in Doe's Complaint.  See Silberman v. Miami Dade Transit,
927 F.3d 1123, 1128 (11th Cir. 2019) (citation omitted).

Doe reached for his phone to change the song, and Roe stood and asked Doe what was wrong.  Id. ¶¶ 90-91.  Doe said nothing was wrong, but he would prefer to have sex, if Roe wanted.  Id. ¶ 91.  Roe said she wanted to have sex, and began to take her shirt off.  Id.  Doe then put on a condom, Roe finished undressing and got on top of Doe, and the two began kissing.  Id. ¶¶ 91-93.  Doe contends there was never penetration during this  encounter, while Roe told the Title IX investigator that there was penetration by Doe's "penis" and "fingers."  Id. ¶¶ 94, 109(b).  Afterwards, Doe stated he was curious what he was missing at the party and asked Roe if she wanted to return to the party to see if the party was "lit yet."  Id. ¶ 95.  Roe responded "sure," both Doe and Roe got dressed, then Doe's friend JM entered the room and Roe left.  Id. ¶¶ 96-97.  According to Doe, Roe had intercourse with JA shortly after their encounter.  Id. ¶ 98.

### B.     The Investigation

On November 6, 2019, Roe filed a formal complaint against Doe with the Emory Title IX Office, alleging Nonconsensual Sexual Intercourse and Nonconsensual Sexual Contract.  Id. ¶ 102.  Roe's complaint did not include intoxication as a reason for her lack of consent, but instead alleged that Doe chocked her with her own belt during sexual intercourse.  Id.  On November 7, 2019, Doe received notice of the allegations.  Id. ¶ 103.  On December 7, 2019,

Doe had his initial interview with Title IX investigator Laura Yearout ("Yearout"). Id. ¶ 104. On January 24, 2020, Roe had her initial interview, reiterating the allegations as stated in her initial written statement. Id. ¶ 105. Roe maintained that she did not feel intoxicated at all during the sexual encounter. Id. ¶ 108.

On April 30, 2020, Kristyne Seidenberg ("Seidenberg") took over the investigation from Yearout; on May 11, 2020, Seidenberg interviewed Doe and Roe separately via Zoom.[2] Id. ¶¶ 111-12. Roe also filed a complaint against JA, and "the Investigator" (presumably Seidelberg) asked Roe and her witnesses questions about her complaints against Doe and JA. Id. ¶ 114. On June 2, 2020, Roe responded to the Investigator's written questions, this time changing her story and claiming she was showing signs of intoxication, and that Doe knew she was drunk. Id. ¶ 115.

On August 14, 2020, the investigation was still ongoing; on that day, according to Doe, the new federally mandated Title IX regulations were imposed, requiring Emory to revise its Title IX policy to provide respondents with procedural protection, including the right to cross-examine. Id. ¶ 116. However, "despite the fact [Emory] had new policies in place, Emory decided to maintain

---

[2] This portion of the investigation occurred during the COVID-19 pandemic. Id. ¶ 110.

parallel policies and continue to investigate and adjudicate Roe's complaint against Plaintiff under the old Title IX Policy." Id.  On September 8, 2020, Siedenburg submitted additional written questions to Roe; in her responses, Roe now contended that her pants and belt were on the floor during the encounter with Doe. Id. ¶ 117.

On October 19, 2020, Siedenburg issued the investigation report.  Id. ¶ 118. On November 4, 2020, Doe submitted a twenty-five page response to the investigation report, outlining numerous alleged factual inaccuracies.  Id. ¶ 119. On November 12, 2020, Doe was issued a notice of the charges against him, containing assertions of policy violations, but making no mention of the specific allegations.  Id. ¶ 120.  On December 16, 2020, Doe received notice of a hearing to be held on February 16, 2021.  Id. ¶ 121.

### C.    The Hearing

On February 16, 2021, the hearing regarding Roe's claims against Doe was held in front of a Panel chaired by Dr. Ely.  Id. ¶¶ 121, 129.  The hearing operated under the Title IX policy that existed prior to the August 14, 2020, updates.  Id.

¶¶ 121-23.  Doe's representatives did not get the right to cross-examine Doe or witnesses "directly."  Id. ¶¶ 116, 123.

During the hearing, Roe was permitted to have three advisers with her and speak directly to Doe during her opening, but Doe was not allowed to do the same. Id. ¶ 124.  Roe's credibility was not questioned during the hearing.  Id. ¶¶ 126-27, 133.  Roe claimed she was "severely intoxicated for the entire day leading up to and after her encounter with [Doe]," and stated that she lied to the investigator in her interviews regarding her intoxication level because she wanted her claims to be believed.  Id. ¶ 125.  When Roe was asked about her claims that Doe choked her with a belt, Roe "walked back" her statement and stated that the choking claims were "misleading."  Id.  Doe indicated that he received more adversarial and probing questions.  Id. ¶¶ 128-29.

### D.    The Panel's Findings and Doe's Sanctions

On March 2, 2021, the Panel issued a notice to Doe which found him responsible for Nonconsensual Sexual Intercourse and Nonconsensual Sexual Contact and suspended him for one semester.  Id. ¶ 130.  The determination found that Doe was less credible than Roe, at least in part because they believed Doe lied about not smoking marijuana, which gave him less credibility with the Panel with respect to the rest of his statements.  Id. ¶¶ 130-31.  In the section of the findings

listing major discrepancies in the investigation report and the statements at the hearing, the Panel wrote "none noted." Id. ¶ 132. The Panel also gave Roe's witnesses who testified that Roe was intoxicated more credibility that Doe's witnesses who testified she was not. Id. ¶ 133.

On March 22, 2021, Doe appealed the Panel's finding based on procedural grounds and bias. Id. ¶ 134. Emory denied the appeal and approved the findings of the Panel and the one-semester suspension. Id. ¶ 135.

### E.    Emory's Relevant Policies

Policy 8.2: Sexual Misconduct (the "Policy") is the applicable policy for Emory's Title IX procedures and states that "[t]he Title IX Coordinator for Students will ensure prompt, fair, and impartial investigations and resolutions of complaints alleging violations of this Policy." Id. ¶ 136, 142. Doe believes that Emory updates and revises the Policy every year. Id. ¶ 137.

## II.   LEGAL STANDARD

Federal Rule of Civil Procedure 8(a)(2) requires that a pleading contain a "short and plain statement of the claim showing that the pleader is entitled to relief." FED. R. CIV. P. 8(a)(2). While this pleading standard does not require "detailed factual allegations," the Supreme Court has held that "labels and conclusions" or "a formulaic recitation of the elements of a cause of action will not

do." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007)).  Under Federal Rule of Civil Procedure 12(b)(6), a claim will be dismissed for failure to state a claim upon which relief can be granted if it does not plead "enough facts to state a claim to relief that is plausible on its face." Twombly, 550 U.S. at 570.  The Supreme Court has explained this standard as follows:

> A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.  The plausibility standard is not akin to a "probability requirement," but it asks for more than a sheer possibility that a defendant has acted unlawfully.

Ashcroft, 556 U.S. at 678 (internal citation omitted).  Thus, a claim will survive a motion to dismiss only if the factual allegations in the pleading are "enough to raise a right to relief above the speculative level." Twombly, 550 U.S. at 555.

At the motion to dismiss stage, the court accepts all well-pleaded facts in the plaintiff's complaint as true, as well as all reasonable inferences drawn from those facts. McGinley v. Houston, 361 F.3d 1328, 1330 (11th Cir. 2004); see also Lotierzo v. Woman's World Med. Ctr., Inc., 278 F.3d 1180, 1182 (11th Cir. 2002). Not only must the court accept the well-pleaded allegations as true, but these allegations must also be construed in the light most favorable to the pleader. Powell v. Thomas, 643 F.3d 1300, 1302 (11th Cir. 2011).  However, the court need

8

not accept legal conclusions, nor must it accept as true legal conclusions couched as factual allegations. Iqbal, 556 U.S. at 678. Thus, evaluation of a motion to dismiss requires the court to assume the veracity of well-pleaded factual allegations and "determine whether they plausibly give rise to an entitlement to relief." Id. at 679.

## III.   DISCUSSION

### A.   Doe Fails to State a Valid Claim for a Violation of Title IX (Count I).[3]

Title IX states that "[n]o person . . . shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). The Supreme Court has held that "Title IX implies a private right of action . . . [and] that it authorizes private parties to seek monetary damages

---

[3] In the Complaint, for some reason, Doe refers to this and subsequent counts with the heading, "As and For a [First, Second, or Third] Cause of Action." Compl. at 50, 56, 59. For simplicity, the Court will refer to Doe's three causes of action as Counts I, II, or III.

for intentional violations of Title IX." Jackson v. Birmingham Bd. of Educ., 544
U.S. 167, 173 (2005) (citation omitted).

In Count I, Doe asserts a claim for "violation of Title IX of the Education
Amendments of 1972 Erroneous Outcome." Compl. ¶¶ 157-74. The "erroneous
outcome" theory of liability under Title IX originated with the Second Circuit's
opinion in Yusuf v. Vassar College, 35 F.3d 709 (2d Cir. 1994), where the court
stated that, when a plaintiff attacking a university disciplinary proceeding claims
he was innocent and wrongly found to have committed an offense,

> allegations of a procedurally or otherwise flawed proceeding that has
> led to an adverse and erroneous outcome combined with a conclusory
> allegation of gender discrimination is not sufficient to survive a motion
> to dismiss. The fatal gap is, again, the lack of a particularized allegation
> relating to a causal connection between the flawed outcome and gender
> bias. A plaintiff must thus allege particular circumstances suggesting
> that gender bias was a motivating factor behind the erroneous finding.

Id. at 715.

Notwithstanding Yusuf, prior to this year, "neither the Supreme Court nor
the Eleventh Circuit Court of Appeals established a framework for analyzing Title
IX challenges to university disciplinary proceedings. Doe v. Valencia Coll., 903
F.3d 1220, 1236 (11th Cir. 2018). In Valencia, the Eleventh Circuit assumed "for
present purposes that a student can show a violation of Title IX by satisfying the
'erroneous outcome' test applied by the Second Circuit in Yusuf." Id. at 1236

(citing Yusuf, 903 F.3d at 714-16). And in 2021, the Eleventh Circuit found that a district court did not err in determining that the plaintiff failed to state a claim for relief under the erroneous outcome theory, assuming for purposes of appeal that such a violation could be established. Whitaker v. Bd. of Regents of Univ. Sys. of Ga., No. 20-13618, 2021 WL 4168151, at *3 (11th Cir. Sept. 14, 2021).

On March 24, 2022, the Eleventh Circuit addressed the threshold question of the legal framework for establishing a violation of Title IX in the context of university disciplinary proceedings. Doe v. Samford Univ., 29 F.4th 675, 688 (11th Cir. 2022) In Samford, the Eleventh Circuit rejected the rationale in Yusuf as not capturing "the full range of conduct that could lead to liability under Title IX" and, instead, adopted the test developed by the Seventh Circuit in Doe v. Purdue University, 928 F.3d 652, 667-68 (7th Cir. 2019), and agreed to by a plurality of sister circuits, which asks whether "the alleged facts, if true, raise a plausible inference" that the university discriminated against the plaintiff on the basis of sex.

> "We agree with the Seventh[ ] Circuit's approach," with one modification, "and see no need to deviate from the text of Title IX." Sheppard [v. Visitors of Va. St. Univ.], 993 F.3d [230,] 236 [(4th Cir. 2021)]. The Seventh Circuit test asks whether the facts "raise a plausible inference" of a Title IX violation, Purdue, 928 F.3d at 668 (emphasis added). And, to be sure, the ultimate inquiry is the "facial plausibility" of the complaint. But facial plausibility is determined by asking whether the facts alleged "allow[ ] the court to draw the

11

> reasonable inference that the defendant is liable." <u>Iqbal</u>, 556 U.S. at
> 678 (emphasis added).  We ask whether the alleged facts, if true, permit
> a reasonable inference that the university discriminated against Doe on
> the basis of sex.

<u>Id.</u> at 687.  Accordingly, this Court will assess whether Doe's allegations permit a

reasonable inference that Emory discriminated against Doe on the basis of sex.[4]

Doe's allegations create three possible avenues to demonstrate such an

inference is warranted: (1) procedural and evidentiary irregularities, (2) public

pressure, and (3) statements of the disciplinary panel.  Compl. ¶¶ 18-47, 66, 70-74,

109, 116-120, 123, 126, 129, 142, 144, 168-69, 172; <u>see also</u> Pl.'s Mem. of Law in

Opp'n to Def.'s Mot. to Dismiss [Doc. 20] ("Pl.'s Mem.") at 10-23.

### 1. The Allegations of Procedural and Evidentiary Irregularities Do Not Permit a Reasonable Inference That Emory Discriminated Against Doe On the Basis of Sex.

Doe relies on a myriad of alleged procedural and evidentiary irregularities,

concluding that Emory "deprive[d] Plaintiff of . . . procedural protections."  <u>See</u>

Compl. ¶ 116.  In particular, Doe contends that:

> Plaintiff points to the blatant disparate treatment of Plaintiff, the male
> respondent, versus Roe, the female complainant, throughout the year-
> long investigation and at the hearing; Emory accepted Roe, and her

---

[4] Many of the arguments proffered in the parties' briefs are based on the Second
Circuit's opinion in <u>Yusuf</u>, but the Eleventh Circuit's more recent decision in
<u>Samford</u> is the precedent which binds this Court.  Accordingly, the Court will view
Doe's allegations in conjunction with the opinion in <u>Samford</u>, not <u>Yusuf</u>.

> female witnesses' [] statements, as facts, and completely disregarded the testimony of Plaintiff, and his three male witnesses, and treated Roe with more warmth, sympathy, and deference at the hearing.
>
> . . . Plaintiff states the hearing panel found that Roe's blatant, admitted lies about intoxication and abandonment of her claims of being choked did not negatively impact her credibility, but found that Plaintiff's alleged "untruthfulness" about marijuana at the party deemed him incredible.
>
> . . . [T]he hearing panel found that Roe's intoxication was a "fact" supported by evidence, when it was only testified by Roe and her two female witnesses, while Plaintiff and three male witnesses testified that Roe was intoxicated.

Pl.'s Mem. at 15-16.  Emory argues that the allegations of procedural and evidentiary irregularities do not demonstrate an anti-male bias.  Def.'s Mem. of Law in Supp. of its Mot. to Dismiss Pl.'s Compl. ("Def.'s Mem.") [Doc. 15-1] at 8-10.

First, "some of [Doe's] alleged deviations are either conclusory or incomplete."  Samford, 29 F.4th at 687-88.  For example, Doe alleged that "Plaintiff was subjected to biased, prejudiced, and unfair process in violation of Title IX."  Compl. ¶ 172.  He further alleges that the investigation report "contained irrelevant, clearly prejudicial information supported by Roe and her witnesses" such as referring to Doe as the "biggest stoner at Emory" and statements that many girls are scared of Doe.  Id. ¶ 118.  Similarly, Doe alleges that the University breached its policy for an impartial investigation by conflating

Doe's investigation with another ongoing investigation filed by Roe against another student, stating that this "[w]as clearly prejudicial and tainted witness testimony." Id. ¶ 142(a); see also id. ¶ 120 (alleging that the investigation report "was clearly created to prejudice Plaintiff"). Like in Samford, "Doe's allegations that the statements were 'prejudicial' . . . are 'not entitled to the assumption of truth' because these allegations are 'labels' and '[un]supported by factual allegations.'" Samford, 29 F.4th at 687-88 (quoting Iqbal, 556 U.S. at 678-79)). The Court also notes that the conclusory allegations that "Emory engaged in gender bias in the Title IX proceedings," and "gender bias was a motivating factor" or that the hearing showed "female complainant favoritism" and the "same bias" as the investigation also are unsupported by specific factual allegations that demonstrate any gender bias against him. See, e.g., Compl. ¶¶ 124, 167.

Second, "Doe's remaining allegations of procedural irregularities do not support a reasonable inference that the university acted 'on the basis of sex.'" Samford, 29 F.4th at 688 (quoting 20 U.S.C. § 1681(a)). The Court summarizes the remaining allegations of procedural and evidentiary irregularities as follows: Doe takes issue with the fact that the August 2020 Title IX regulations were not applied. Compl. ¶¶ 6, 123, 126, 168(d). In particular, Doe alleges that he was presumed as guilty, id. ¶¶ 66(a), 129, 169(h); that the notice of charges was

insufficient, id. ¶¶ 66(h), 103, 120; that his investigator was not impartial, id. ¶ 168; that the preponderance of the evidence standard was not properly applied, id. ¶ 168(g); and that he was not allowed to cross-examine Roe, id. ¶¶ 109, 123, 168. Doe also alleges that Roe's credibility—specifically her credibility as it relates to intoxication—was not questioned but the Panel determined that Doe's testimony was not credible. Id. ¶¶ 4-5, 102, 108, 113, 125-26, 131-33. Doe also alleges that Roe was asked several leading questions. Id. ¶ 109.

Even assuming *arguendo* that Emory did not apply the appropriate Title IX regulations, both the Eleventh Circuit and the Supreme Court have held that a deviation from Title IX policy is not by itself evidence of gender discrimination under Title IX:

> A deviation from a Title IX policy is not, in and of itself, a violation of Title IX. Cf. Gebser [v. Lago Vista Indep. Sch. Dist.], 524 U.S. [274,] 292 [(1998)] (holding that a school's failure to follow a Title IX regulation "d[id] not itself constitute 'discrimination' under Title IX"). To be sure, that kind of deviation is at least "consistent with" sex discrimination. See Twombly, 550 U.S. at 554 (emphasis added). But allegations that are "merely consistent with" liability "stop[ ] short of the line between possibility and plausibility." See id. at 557. And Doe's "bare assertion" that the procedural irregularities are attributable to his sex does not make his speculation plausible. See id. at 555-56; Austin v. Univ. of Or., 925 F.3d 1133, 1138 (9th Cir. 2019) (explaining that the plaintiffs had failed to state a Title IX claim "because the [plaintiffs] d[id] not articulate any basis to discern that the administration or outcomes of the disciplinary proceedings were flawed due to the [plaintiffs]' sex"); [Doe v.] Columbia Coll., 933 F.3d [849,] 856 [(7th Cir. 2019)] (explaining that alleged restrictions on a

respondent's "access to documents relevant to the investigation" did not "demonstrate[ ] an anti-male bias" in part because "th[e] allegation [was] divorced from [sex]—Doe d[id] not allege that females accused of sexual assault were allowed to review materials or that only female victims were allowed to review them"); Yusuf, 35 F.3d at 715 ("[A]llegations of a procedurally or otherwise flawed proceeding . . . combined with a conclusory allegation of [sex] discrimination [are] not sufficient to survive a motion to dismiss.").

Samford, 29 F.4th at 688-89.  See also Doe v. Cummins, 662 F. App'x 437, 453 (6th Cir. 2016) ("[W]ithout additional facts linking these alleged procedural deficiencies to gender bias, these procedural defects do not create a plausible inference of gender discrimination under Title IX.").

"Numerous courts have held that even if a university treated a female student more favorably than the plaintiff, during the disciplinary process, the mere fact that plaintiff is male and the alleged victim is female does not suggest that the disparate treatment was because of plaintiff's sex." Doe v. Univ. of S. Ala., No. CV 17-0394-CG-C, 2020 WL 759895, at *13 (S.D. Ala. Feb. 14, 2020) (internal punctuation accepted, quotation and citation omitted).  "[T]he fact of procedural missteps that happened to disadvantage a male student in favor of a female student do not, standing alone, support the plausible inference that those missteps occurred because of the accused student's gender."  Doe v. Lynn Univ., Inc., 235 F. Supp. 3d 1336, 1342 (S.D. Fla. 2017) (citation and quotation omitted); see also

Cummins, 662 F. App'x at 453 ("Appellants, however, fail to show how these alleged procedural deficiencies are connected to gender bias.  As noted by the district court, these deficiencies at most show a disciplinary system that is biased in favor of alleged victims and against those accused of misconduct.  But this does not equate to gender bias because sexual-assault victims can be both male and female.").[5]

Accordingly, Doe's allegations of procedural and evidentiary irregularities fail to raise a reasonable inference of a Title IX violation.[6]

---

[5] Indeed, even if the procedural irregularities could state a claim supporting reasonable inference of anti-male bias when viewed alongside Doe's other allegations, Doe has failed to include the allegations to support an inference of anti-male bias, as discussed below.  Doe v. Samford Univ., No. 2:21-CV-00871-ACA, 2021 WL 3617702, at *10 (N.D. Ala. Aug. 15, 2021), aff'd, 29 F.4th 675 (11th Cir. 2022) ("The procedural irregularities could, if considered along with some other allegations supporting a reasonable inference of anti-male bias, suffice to state a claim.  But John Doe has not provided other allegations that support a reasonable inference of anti-male bias.").

[6] Although not mentioned in his brief, Doe's Complaint also includes several allegations that Emory was required to provide adequate sexual assault training via Title IX and by the Policy.  See Compl. ¶¶ 66(f), 144, 165.  However, Doe alleges Emory did not provide training as required for the investigators and hearing panel officers.  Id. ¶ 144(a), 177(e).  The alleged procedural failure and policy deviation of improper training fails to show discrimination for the same reasons described above, namely, because a policy deviation is not a Title IX violation.  Samford, 29 F.4th at 688-89.  In addition,

Plaintiff's training allegations also fail to support an inference of gender bias by Defendants "because there is no logical connection between an

2.  **The Allegations of Public Pressure on Emory Do Not Permit A Reasonable Inference That Emory Discriminated Against Doe On the Basis of Sex.**

Doe argues that the Complaint sufficiently alleges discrimination on the basis of his sex because of public pressure on Emory to prosecute males aggressively and protect women on campus. Pl.'s Mem. at 11, 14-19, 22. Emory contends that the allegations relating to public or internal pressure do not support an inference of bias against males. Def.'s Mem. at 10-13.

The Complaint includes several allegations about the "Dear Colleague" letter issued by the U.S. Department of Education's Office of Civil Rights in April 2011, including allegations that because Emory was one of the universities under investigation it was at risk of losing federal funds. Compl. ¶¶ 18-47. However, allegations of pressure stemming from events such as the "Dear Colleague" letter have been rejected by the Eleventh Circuit. Samford, 29 F.4th at 692 (holding that

---

inadequately trained investigator and gender bias." Mancini v. Rollins Coll., 2017 WL 3088102, at *6 (M.D. Fla. July 20, 2017). "Logically, an untrained investigator would pose similar problems and risks to both parties—regardless of sex." Id.

Univ. of S. Ala., 2020 WL 759895, at *13.

18

allegations related to the "Dear Colleague" letter do not show discrimination on the basis of sex).[7]

> Plaintiff's allegations regarding the Dear Colleague letter do not show a gender bias. Absent university-specific allegations of community pressure, allegations of a national bias against males based on the letter have been found insufficient to support an inference of gender bias. See Cummins, 662 F. App'x at 452-53. General allegations "that the Department of Education's 'Dear Colleague Letter' induced [the University] to discriminate against males in sexual-assault investigations in order to preserve federal funding," "without more, is insufficient to create a plausible claim of gender bias under Title IX." Id. at 453.

Univ. of S. Ala., 2020 WL 759895, at *13.

The Court also finds Doe's allegations concerning public pressure specific to Emory are insufficient to permit a reasonable inference that the investigation or adjudication of Roe's complaint was tainted by gender bias. First, Doe cites to criticism in the form of public protest and adverse news coverage related to a 1991 event:

> Incredibly, student outrage over Emory's mishandling of complaints of sexual misconduct against male students and faculty dates back more than *30 years*. In 1991, 200 law students marched in protest of the University's lack of action taken regarding the complaints of 13 women that a male professor had tried to kiss them without consent, invited them on dates, and called them at their homes. *See Emory Move In Sex*

---

[7] As did the plaintiff in Samford, Doe "concedes that the Department of Education formally rescinded the 2011 Dear Colleague Letter on September 22, 2017." Id. at 691; Compl. ¶ 46.

> *a Case Spurs Protest,* The New York Times (Mar. 20, 1991).   The
> students called on the University to suspend the professor after it took
> no action against the professor.   Id.

Compl. ¶ 68.   Second, Doe alleges an instance of press coverage in 2018 relating to

another litigation matter involving Emory:

> In 2018, Emory's bias resulted in legal troubles for the University when
> a male student sued Emory for holding "biased assumptions that female
> students would not make false accusations of sexual assault against
> their fellow male students."   *See* Julia Munslow and Michelle Lou,
> *Former Student Sues Emory, Citing Bias in Title IX Process,* The
> Emory    Wheel    (Mar.    7,    2018),    available    at
> https://emorywheel.com/27356-2/.

Id. ¶ 72.

Like in <u>Samford</u>, "[n]othing about these [public pressure] allegations

[against Emory] supports a reasonable inference that anti-male bias caused the

erroneous outcome."   <u>Samford Univ.</u>, 2021 WL 3617702, at *10 (finding that

allegations of public pressure on the university stemming from public criticism of

the school's initiatives was not sufficient to show a plausible inference of gender

bias).   The 1991 protest occurred nearly 30 years ago, and is therefore too remote

to support an inference that Emory discriminated against Doe in 2020-21 because

he was male.   Similarly, the single 2018 lawsuit which alleged that Emory tended

to believe female accusations involving sexual assault also do not provide a reason

to believe there was gender discrimination against Doe.   In cases where courts

20

have found other litigation to be sufficient to draw an inference of bias, there were allegations of multiple instances of adverse news coverage resulting from the litigation, and those allegations included media criticism of the adequacy of the university's Title IX procedural protections, which is not alleged here. See e.g., Doe v. Rollins Coll., 352 F. Supp. 3d 1205, 1210 (M.D. Fla. 2019) (discussing more than one example of press following another lawsuit, including an article that "highlighted how Rollins failed to provide accused students with a hearing or cross-examination tools and that subsequent litigation has not done much to move the needle back towards a fairer process for students accused of sexual misconduct and other serious wrongdoing." (internal quotations omitted)).  Here, the Complaint does not allege "a clamor of public and campus scrutiny over its treatment of sexual assault complaints by female students," Rollins, 362 F. Supp. 3d at 1210, but simply mentions a single article that describing a pending lawsuit (the results of which are not mentioned), and does not allege any additional press coverage that criticized the adequacy of the Title IX procedural protections. Accordingly, "the alleged facts, if true," do not "permit a reasonable inference that the university discriminated against Doe on the basis of sex." Samford, 29 F.4th at 687.

Next, the Complaint also enumerates several events hosted by Emory, including: 2013 RespectCon, which focused on sexual assault awareness and "engaging men in sexual violence prevention," Compl. ¶ 70; the 2014 RealConsent program, which was a sexual assault educational programs "for college males," id. ¶ 71; and 2019 RespectCon19, which featured a talk from Men Stopping Violence about the "Definition of Male Sexual Violence against Women: Implications for Engaging men on Campus" and also a discussion called "Masculinity as a Failed Project," id. ¶¶ 73-74.  Doe argues that these "events programs, and trainings from Emory make it clear that the University views the issue of sexual assault as one affecting women in particular and viewed men as the perpetrators."  Pl.'s Mem. at 14-15; see also Compl. ¶ 169(b) (alleging that Emory's sexual assault training for males shows that Emory has preconceived notions that men are perpetrators of sexual assault).

However, courts have found university programing aimed at protecting women does "little to advance the actual gender discrimination claim at issue." Doe v. Univ. of Chicago, No. 16 C 08298, 2017 WL 4163960, at *5 (N.D. Ill. Sept. 20, 2017) (finding that the allegation that the university endorsed "the Clothesline Project, a project dedicated to breaking the silence about violence

against women" among other sexual assault awareness programs, did not

"plausibly allege an anti-male bias.").

> Plaintiffs' allegations concerning the sexual assault training provided
> to UC staff members and pressure allegedly exerted on universities by
> the Department of Education to intensify their response to sexual
> assault complaints fall short of creating a reasonable inference that the
> ARC panels in Plaintiffs' cases were biased.  It should be a laudable
> goal for a university to raise the awareness of its faculty and staff to
> sexual assault and to increase their sensitivity to the particular problems
> that victims of sexual violence experience in coming forward to make
> complaints.

Doe v. Univ. of Cincinnati, 173 F. Supp. 3d 586, 602 (S.D. Ohio 2016).

Accordingly, these allegations also do not "permit a reasonable inference that the

university discriminated against Doe on the basis of sex."  Samford, 29 F.4th at

687.

### 3.     Dr. Ely's Lone Statement Does Not Permit a Reasonable Inference That Emory Discriminated Against Doe On the Basis of Sex.

Doe summarizes the general rule from Yusuf that a plaintiff may show

gender bias by alleging "statements by members of the disciplinary tribunal,

statements by pertinent university officials, or patterns of decision-making that also

tend to show the influence of gender."  Pl.'s Mem. at 11 (quoting Yusuf, 35 F.3d at

715).  Included in Doe's compendium of paragraphs in the Complaint which he

asserts shows gender bias on behalf of Emory is Paragraph 129 of his Complaint, which reads:

> Notably, the Chair of the panel, Dr. Ely, after warmly stating that Roe would testify first, changed his tone and stated the Plaintiff would then testify as to "what he thinks went on," revealing that Plaintiff was presumed as guilty, and that his credibility and defense were treated as suspicious.

Compl. ¶ 129; see also Compl. ¶ 169(h) ("Defendant's failure to afford Plaintiff the presumption of innocence as evidenced by the panel's statement that Plaintiff would testify as to what he 'thinks' happened."). Dr. Ely's request to Doe to testify as to "what he thinks went on" does not support a reasonable inference that the Panel discriminated against Doe on the basis of sex. Indeed, the instances where courts have found a statement is sufficient to infer bias do not involve tone, but instead involve explicit statements or endorsements that show overt discrimination. Doe v. Brown Univ., 166 F. Supp. 3d 177, 189 (D.R.I. 2016) (denying a motion to dismiss on a Title IX claim because the complaint contained "specific allegation related to gender bias" including allegations about a university employee's statements that the university treats students male students as "guilty, until proven innocent," and that Brown has "loaded the dice against boys," and that the fact-finding process in the university's cases of sexual misconduct assumes it's the "boy's fault," as well as numerous allegations of procedural flaws); Doe v.

<u>Wash. & Lee Univ.</u>, No. 6:14-CV-00052, 2015 WL 4647996, at *10 (W.D. Va. Aug. 5, 2015) (denying a motion to dismiss a Title IX claim in part because of allegations that a university official endorsed an article written for a female-focused website which posited "that sexual assault occurs whenever a woman has consensual sex with an man and regrets it because she had internal reservations that she did not outwardly express.")).

Accepting all the well-pleaded facts in the Complaint as true, as well as the reasonable inferences drawn from those facts, the Court finds that Doe has failed to sufficiently create a reasonable inference that Emory discriminated against Doe on the basis of gender in violation of Title IX. Accordingly, Emory's Motion to Dismiss Count I is **GRANTED**.

### B.   The Complaint Fails to State a Claim for Breach of Contract (Count II).

In Count II, Doe asserts a breach of contract claim. Compl. ¶¶ 176-80. Doe bases his breach of contract claim on the Policy, arguing that "[t]he terms of the sexual misconduct policy outlined procedures to be followed for the investigation, hearing and adjudication of sexual misconduct allegations . . . . [Emory] failed to follow said procedures in the university's disciplinary proceeding aglint [Doe]." Pl.'s Mem. at 24.

"To establish a breach of contract claim, a plaintiff must show (1) an enforceable agreement, (2) breach of that agreement, and (3) damages as a result of that breach." Reindel v. Mobile Content Network Co., LLC, 652 F. Supp. 2d 1278, 1287 (N.D. Ga. 2009) (citing Broughton v. Johnson, 247 Ga. App. 819, (2001)). Under Georgia law, the essential elements of an enforceable agreement include (1) parties able to contract, (2) consideration, (3) assent of the parties to the terms, and (4) subject matter to which the contract may operate. O.C.G.A. § 13-3-1. To prevail on a breach of contract claim, the plaintiff has the burden of pleading and proving mutual assent. Broughton, 247 Ga. App. at 819; Dasher v. RBC Bank (USA), 882 F.3d 1017, 1023 (11th Cir. 2018).

> Mutual assent, or a meeting of the minds, "is the first requirement of the law relative to contracts." Simmons v. McBride, 228 Ga. App. 752, 753 (1997). To have an enforceable agreement, "the parties must have a distinct intention common to both and without doubt or difference. Until all understand alike, there can be no assent . . . to the same thing in the same sense, and their minds must meet as to all the terms." Id. (internal quotation marks and punctuation omitted); see also O.C.G.A. § 13-3-2 (requiring mutual assent for a contract to become enforceable).

Doe v. Emory Univ., No. 1:20-CV-2002-TWT, 2021 WL 358391, at *5 (N.D. Ga. Jan. 22, 2021).

Emory argues that that Doe has failed to allege mutual assent to the Policy. Def.'s Mem. at 17. Doe responds with only a conclusory statement that "[t]he

26

parties mutual assented to the terms of the sexual misconduct policy (Policy

8.2)[,]" Pl.'s Mem. at 24, but provides no factual or legal support for his

contention.

The Court finds Judge Thrash's recent decision in a case involving Emory as

the defendant to be instructive. See Emory Univ., 2021 WL 358391, at *1. A full-

time nursing student at Emory filed a breach of contract claim, alleging that Emory

breached its agreement to provide in-person classes. Id. Emory argued that the

Amended Complaint failed to allege Emory's assent to be bound by the terms the

plaintiffs claimed were breached, and that the plaintiffs failed to allege their own

assent. Id. at *5. The court held that while the course webpage indicating that the

instruction method was in person was sufficient to allege an offer made by Emory,

"there is a lack of allegations regarding the Plaintiffs' knowledge of the

Defendant's offer and their acceptance of that offer." Id. at *6. The court

concluded that the plaintiff "has not sufficiently alleged facts that indicate her own

assent to Emory's alleged offer of in-person instruction" and "[w]ithout allegations

of her own assent, Plaintiff Doe had not sufficiently pleaded a valid express

contract." Id. (emphasis added).

Doe's breach of contract claim fails here for the same reason. Even

assuming *arguendo* that Emory's act of dissemination of the Policy and posting the

Policy online constituted an offer, Compl. ¶¶ 138, 182, Doe "has not sufficiently alleged facts that indicate [his] own assent." Emory Univ., 2021 WL 358391, at *6. Doe's only allegations that relate to his own assent are that he matriculated into Emory, paid tuition, and complied with relevant policies. Compl. ¶ 136 ("Upon Plaintiff's matriculation to Emory, Plaintiff and Emory became mutually bound by the 'Policy 8.2: Sexual Misconduct' document. . . ."), ¶ 182 ("At all times relevant hereto, a contractual relationship existed between Plaintiff and Emory through . . . Plaintiff's tuition payment and other considerations, such as compliance with the University's relevant policies."). However, mere enrollment as a student is not sufficient to show mutual assent. Emory Univ., 2021 WL 358391, at *6 (finding no mutual assent even in the face of allegations that the plaintiff matriculated as a student).

The cases relied on by Doe are distinguishable. In Williams v. Corp. of Mercer University, 542 F. Supp. 3d 1366, 1376 (M.D. Ga. 2021), the court found that the statements on a university's web page offering in-person instruction was an offer. Id. Critically, the court found that the plaintiff included the allegation that she (and other students) selected their course based on a knowledge of this offer for in-person classes, and thus mutually assented when they selected and paid for these courses. Id. ("Plaintiff

claims that when she, and other students selected courses for the Spring 2020 semester they did so based, in part, on the delivery method in the My Mercer Portal."). <u>Williams</u> therefore is distinguishable from the underlying case, which is devoid of any allegation that Doe had knowledge of the Policy, or chose Emory based on the Policy.  And while <u>McCawley v. Universidad Carlos Albizu, Inc.</u>, 461 F. Supp. 2d 1251, 1255 (S.D. Fla. 2006), found university policies did form a contract, that case also is easily distinguishable as it involved a Graduate Student Agreement, signed by the student, which clearly manifested the student's assent to the policies.  There is no allegation that there was a signed agreement in this case.

Doe has failed to allege "a distinct intention common to both" himself and Emory "without doubt or difference."  <u>Leone Hall Price Found. v. Baker</u>, 276 Ga. 318, 320 (2003).  Because the Complaint does not allege that Doe had knowledge of the Policy, there is no plausible allegation to permit the Court to conclude that there was assent "to the same thing in the same sense, and [Emory and Doe's] minds [met] as to all terms."  <u>Simmons</u>, 228 Ga. App. at 752.  Accordingly, Emory's Motion to Dismiss is **GRANTED** as to Count II of the Complaint.

**C.    The Complaint Fails to State a Claim for Intentional and Knowing Breach of Contract under O.C.G.A. § 51-12-10 (Count III).**

In Count III, Doe asserts a claim for intentional and knowing breach of contract pursuant to O.C.G.A. § 51-12-10.  Compl. ¶¶ 181-88.  "When a tort is committed, a contract is broken, or a duty is omitted with knowledge and for the purpose of depriving the plaintiff of certain contemplated benefits, the remote damages occasioned thereby become a proper subject for the consideration of the jury."  O.C.G.A. § 51-12-10.

Emory argues *inter alia* that even if this statute created an independent vehicle for liability,[8] Doe's claim still fails because Doe cannot establish the existence of an enforceable contract between Doe and Emory.  Def.'s Mem. at 25.  Because Doe has failed to show the existence of an enforceable agreement, his claim for an intentional breach of contract also fails.

---

[8] Often, this statute is viewed as an exception to the rule against remote damages, rather than as an independent cause of action.  See, e.g., Blue Ridge Mountain Fisheries, Inc. v. Dep't of Nat. Res., 217 Ga. App. 89, 94 (1995) ("This exception to the rule against recovery of remote damages does not authorize the recovery of anticipated future profits by a business that has not made any profits in the past.").

Therefore, Emory's Motion to Dismiss is **GRANTED** as to Count III of the Complaint.[9]

## IV.   CONCLUSION

For the foregoing reasons, Defendant Emory University's Motion to Dismiss [Doc. 15] is **GRANTED**.

The Clerk is **DIRECTED** to close this case.

**IT IS SO ORDERED** this 1st day of September, 2022.

MARK H. COHEN
United States District Judge

---

[9] At the end of his opposition of Emory's Motion to Dismiss, Doe requests permission to amend his complaint "to the extent this court is inclined to dismiss any claims[.]". Pl.'s Mem. at 25.  However, Doe has not filed any motion to amend, nor has he detailed what he would intend to include in such an amendment.

> "Where a request for leave to file an amended complaint simply is imbedded within an opposition memorandum, the issue has not been raised properly." Posner v. Essex Ins. Co., 178 F.3d 1209, 1222 (11th Cir. 1999).  The shareholders also failed to comply with Federal Rule of Civil Procedure 7(b) when they failed to attach a copy of their proposed amendment or to describe the substance of their proposed amendment.  See [Long v.] Satz, 181 F.3d [1275,] 1279-80 [(11th Cir. 1999)].

Rosenberg v. Gould, 554 F.3d 962, 967 (11th Cir. 2009).  Accordingly, Doe's informal request to amend is **DENIED**.