[PUBLISH]

# In the
# United States Court of Appeals
# For the Eleventh Circuit

_____

No. 22-13293

_____

JOHN DOE,

                                              Plaintiff-Appellant,

*versus*

EMORY UNIVERSITY,

                                              Defendant-Appellee.

_____

Appeal from the United States District Court
for the Northern District of Georgia
D.C. Docket No. 1:21-cv-02763-MHC

_____

Case 1:21-cv-02763-MHC   Document 36   Filed 08/01/24   Page 2 of 20
USCA11 Case: 22-13293   Document: 46-1   Date Filed: 08/01/2024   Page: 2 of 18

2                    Opinion of the Court                 22-13293

Before NEWSOM, BRANCH, and LUCK, Circuit Judges.

NEWSOM, Circuit Judge:

Title IX of the Education Amendments of 1972 prohibits a recipient of federal funds from discriminating against any individual "on the basis of sex." If, in the course of investigating an alleged sexual assault, a university gives preferential treatment to women over men, it exhibits gender bias and risks violating Title IX. Our decision in *Doe v. Samford University*, however, carefully distinguishes pro-*female* bias, which Title IX prohibits, from "pro-*complainant* bias," which it does not. 29 F.4th 675, 689 (11th Cir. 2022) (emphasis added). More particularly, we held in *Samford* that a Title IX plaintiff challenging the fairness of a university's sexual-misconduct investigation must allege facts that, if true, "permit a reasonable inference that the university discriminated against [him] on the basis of sex." *Id*. at 687. Significantly for present purposes, we further held (1) that "allegations that are merely consistent with liability stop short of the line between possibility and plausibility" that a plaintiff must cross in order to survive a defendant's motion to dismiss, (2) that allegations are legally insufficient when there is an "obvious alternative explanation[]" for the challenged practice "that suggest[s] lawful conduct," and (3) that "pro-complainant bias" constitutes such a lawful explanation. *Id*. at 688–89 (quotation marks omitted).

Applying *Samford*'s framework to this case, which arises in a materially identical procedural posture and against a similar factual backdrop, we hold that John Doe's complaint's allegations are

Case 1:21-cv-02763-MHC   Document 36   Filed 08/01/24   Page 3 of 20
USCA11 Case: 22-13293   Document: 46-1   Date Filed: 08/01/2024   Page: 3 of 18

22-13293               Opinion of the Court                3

consistent with the "obvious alternative explanation" that Emory University's handling of the sexual-misconduct complaint against him exhibited "pro-complainant bias" rather than pro-female bias, and thus fail to cross the all-important "line between possibility and plausibility." We will therefore affirm the district court's dismissal of Doe's Title IX claim.

Doe also contends that Emory breached a contractual obligation to conduct its sexual-misconduct investigation in a certain manner. Because we conclude that Doe's complaint plausibly alleges that he and Emory mutually assented to an implied contract embodied in the university's duly promulgated sexual-misconduct policy, we will reverse the district court's dismissal of his contract-based claims and remand for further proceedings on those counts.

**I**

This case arises out of an alleged sexual assault at Emory University in April 2019. The accuser, Jane Roe, attended a party at a campus fraternity house. While there, she asked the accused, John Doe, if she and her friend "ER" could go to his room to smoke marijuana. Doe agreed.

Roe and ER accompanied Doe and his friend "IK" to Doe's room, but it turned out that he didn't have any weed, so ER and IK left, leaving Doe and Roe alone. Doe went to the bathroom, and when he returned Roe was on his bed. Doe and Roe kissed and engaged in oral sex. Doe told Roe that he wanted to have intercourse, and he claims that she agreed.

Case 1:21-cv-02763-MHC   Document 36   Filed 08/01/24   Page 4 of 20
USCA11 Case: 22-13293   Document: 46-1   Date Filed: 08/01/2024   Page: 4 of 18

4                    Opinion of the Court                 22-13293

After they had sex, Doe asked Roe if she wanted to rejoin the party, and she said she did. Doe's friend "JM" then came into the room. Doe stayed with JM, while Roe went back downstairs, where she met up with another partygoer, "JA."

Some six months later, Roe filed a Title IX complaint alleging that while they were alone in his room together, Doe had engaged in nonconsensual intercourse with her and choked her with her belt. She filed a separate complaint against JA regarding their sexual encounter which, according to Doe, occurred later that same night.

Doe received notice of Roe's allegation the following day and, about a month later, was interviewed by Emory's Title IX investigator, Laura Yearout. Another six weeks passed, and Yearout eventually interviewed Roe, who reiterated her allegations against Doe.

Doe didn't hear anything more from Emory's Title IX office until April 2020, when he was told that Yearout had been replaced by a new investigator, Kristyne Seidenberg. When Seidenberg conducted her own round of questioning—first via Zoom, then by email—Roe began to change her story. In June 2020, for instance, Roe asserted for the first time that she had been drunk during her encounter with Doe. More significantly, in September 2020, Roe recanted a material part of her earlier allegation, admitting that her belt was actually on the floor and not being held against her neck.

In October 2020, Seidenberg released the report of her investigation. Although Seidenberg's report isn't in the record, we're

Case 1:21-cv-02763-MHC   Document 36   Filed 08/01/24   Page 5 of 20
USCA11 Case: 22-13293   Document: 46-1   Date Filed: 08/01/2024   Page: 5 of 18

22-13293                Opinion of the Court                5

told by Doe that it contained "numerous inaccuracies," including, he says, that he was "the biggest stoner at Emory" and that "a lot of girls" were "scared" of him. Doe submitted a 25-page response attacking the report, but to no avail. In November, he was formally charged with nonconsensual sexual contact and nonconsensual sexual intercourse, and by February 2021 he was on trial in a school-run hearing before a panel of Emory administrators.

In his complaint, Doe challenged the fairness of the hearing in multiple respects. He claimed, for instance, that Roe was allowed to cross-examine him but that he wasn't permitted to cross-examine her. He said that Roe and her female witnesses were treated with more kindness, presumed to be truthful, and given deference not afforded to Doe or his male witnesses. He complained that he was allowed fewer advisors at counsel table than Roe was. And he alleged that the hearing panel grilled him with hostile questions but asked Roe and her female witnesses only softballs and refused to ask them any of the more probing questions that he had submitted.

Even so, Doe did manage to score a few points during the hearing. In her testimony, Roe contradicted her complaint and her initial interview responses. She asserted, for instance, that she was intoxicated *the entire day* of the encounter, and she admitted again that Doe had never choked her. Most notably, Roe acknowledged at the hearing that she had lied earlier because she thought it would be better for her case.

Case 1:21-cv-02763-MHC   Document 36   Filed 08/01/24   Page 6 of 20
USCA11 Case: 22-13293   Document: 46-1   Date Filed: 08/01/2024   Page: 6 of 18

6                        Opinion of the Court                   22-13293

Despite Roe's reversals, Emory found Doe responsible for sexual misconduct and suspended him for a semester. Doe filed an internal appeal, which Emory denied.

## II

Doe brought suit in federal district court to challenge Emory's handling of the sexual-misconduct allegations against him. He contended, in particular, that Emory both (1) violated Title IX by discriminating against him "on the basis of sex" and (2) breached a contract that guaranteed him certain procedural protections. Emory filed a motion to dismiss Doe's suit for failure to state a claim, which the district court granted with prejudice and without leave to amend. In short, the district court dismissed Doe's Title IX claim on the ground that his allegations were explained as reflecting mere pro-*complainant* bias, and thus didn't "plausibl[y]" allege pro-*female* bias. The court dismissed Doe's contract-based claims on the ground that he had failed to allege that the parties had mutually assented to contract terms.

This is Doe's appeal. We review the district court's dismissal of Doe's complaint de novo and its denial of his motion for leave to amend for abuse of discretion. *See Darrisaw v. Pennsylvania Higher Educ. Assistance Agency*, 949 F.3d 1302, 1304 (11th Cir. 2020); *Bowers v. U.S. Parole Comm'n, Warden*, 760 F.3d 1177, 1183 (11th Cir. 2014).

## III

We will address Doe's Title IX and breach-of-contract claims in turn. For reasons we will explain, we affirm the district court's

Case 1:21-cv-02763-MHC   Document 36   Filed 08/01/24   Page 7 of 20
USCA11 Case: 22-13293   Document: 46-1   Date Filed: 08/01/2024   Page: 7 of 18

22-13293               Opinion of the Court                    7

dismissal of Doe's Title IX claim but reverse its dismissal of his contract claims.

### A

In relevant part, Title IX prohibits an educational institution that receives federal funds from discriminating against any individual "on the basis of sex." 20 U.S.C. § 1681(a). This court's decision in *Doe v. Samford University*, 29 F.4th 675 (11th Cir. 2022), provides the governing framework for our consideration of Doe's Title IX claim. Under *Samford*, a university's process for investigating sexual misconduct may violate Title IX where the plaintiff "allege[s] facts [that] if true, permit a reasonable inference that the university discriminated against [him] on the basis of sex." *Id*. at 687. While not identical, the broad outlines of the dispute in *Samford* mirror those here: Like this case, *Samford* involved a sexual-misconduct episode, an investigation and hearing involving the alleged male perpetrator, and a culpability finding premised on supposed gender bias.

Importantly, the *Samford* Court held that "allegations that are *merely consistent* with liability stop short of the line between possibility and plausibility" that a plaintiff must cross in order to survive a defendant's motion to dismiss. *Id*. at 688 (quotation marks omitted and emphasis added). The Court further held that an allegation is "merely consistent" with liability—and thus legally insufficient—when there is an "obvious alternative explanation[ ]" for the challenged practice "that suggest[s] lawful conduct." *Id*. at 689 (quotation marks omitted). Finally, the Court specified that those

Case 1:21-cv-02763-MHC   Document 36   Filed 08/01/24   Page 8 of 20
USCA11 Case: 22-13293   Document: 46-1   Date Filed: 08/01/2024   Page: 8 of 18

8                     Opinion of the Court                   22-13293

non-actionable explanations include "ineptitude, inexperience, and *pro-complainant bias*." *Id*. (emphasis added). To be clear, then, it's not enough that a Title IX plaintiff's allegations plausibly indicate bias in favor of an accuser or against an accused; they must go farther and plausibly indicate bias in favor of one sex or against the other.

In an effort to demonstrate that Emory engaged in unlawful sex discrimination, Doe alleges (1) that the university's investigation was plagued by procedural and evidentiary irregularities, (2) that members of the disciplinary panel that decided his case made statements indicating anti-male bias, and (3) that the university faced—and caved to—overwhelming public pressure to credit female accusers over male suspects. The district court was unpersuaded. So are we.

We'll consider each category of allegations in turn.

1

Category 1—procedural defects. In his complaint, Doe assailed three such defects as "prejudicial": (1) his receipt of "biased, prejudiced, and explicitly unfair process"; (2) the investigatory report's inclusion of "irrelevant, clearly prejudicial information," such as Doe's supposed reputation as "the biggest stoner at Emory" and someone of whom "a lot of girls" were "scared"; and (3) the panel's conflation of Roe's cases against Doe and JA, which Doe said "was clearly prejudicial and tainted witness testimony." Doc. 1 at 37, 43, 56. But as the district court explained, under *Samford*, such conclusory assertions—unadorned "labels" like

Case 1:21-cv-02763-MHC   Document 36   Filed 08/01/24   Page 9 of 20
USCA11 Case: 22-13293   Document: 46-1   Date Filed: 08/01/2024   Page: 9 of 18

22-13293               Opinion of the Court                9

"prejudicial"—aren't "entitled to the assumption of truth" when, as here, they are "[un]supported by factual allegations." 29 F.4th at 687–88 (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678–79 (2009)).

To be sure, some of Doe's procedure-based allegations were more specific—for instance, that he was presumed guilty, that he received insufficient notice, that his investigation wasn't impartial, that the preponderance standard was improperly applied, that he wasn't allowed to cross examine Roe, and that the panel credited Roe's female witnesses over his male witnesses. *See* Doc. 1 at 41, 43, 46, 49, 58. To the extent that Doe means to suggest that Emory's deviation from its own Title IX policy is itself a Title IX violation, we rejected the same argument in *Samford*. *See* 29 F.4th at 688. Moreover, and in any event, as the district court correctly explained, those supposed deficiencies, while perhaps "consistent with" gender bias, aren't necessarily indicative of it. As in *Samford*, there remains an "obvious alternative explanation"—namely, that the deficiencies Doe identifies suggest "pro-complainant bias." *Id.* at 689. Such bias isn't necessarily suggestive of unlawful sex discrimination under Title IX because, of course, a complainant can be either male or female.

**2**

Category 2—panel members' statements. Doe's complaint features only one such statement, allegedly uttered by the panel's chair, Dr. William Eley. According to the complaint, "after warmly stating that Roe would testify first," Dr. Eley "changed his tone and stated [that Doe] would testify as to 'what he thinks went on.'"

Case 1:21-cv-02763-MHC   Document 36   Filed 08/01/24   Page 10 of 20
USCA11 Case: 22-13293   Document: 46-1   Date Filed: 08/01/2024   Page: 10 of 18

10                        Opinion of the Court                     22-13293

Doc. 1 at 40.  Even giving Doe the benefit of the doubt and treating Dr. Eley's statement as hostile, nothing about its content or "tone" implies that Dr. Eley harbored a bias against Doe because he was a man—rather than because, for instance, he was an alleged perpetrator.

### 3

That leads us to Category 3—the history of public pressure on Emory to step up its response to alleged sexual misconduct. And to be fair, there is indeed some such history, stretching back more than three decades.  Doe's complaint alleges, for instance, that in 1991, hundreds of Emory students marched in protest of the university's perceived inaction in the face of harassment complaints against a law professor.  *See* Doc. 1 at 23.  More recently, in 2011, the Department of Education's Office for Civil Rights (OCR) issued a "Dear Colleague Letter" advising universities receiving federal funding to crack down on sexual misconduct and to "minimize the burden on [victims]" by, among other things, strongly discouraging accused students from cross-examining alleged victims in disciplinary hearings.  *See id.* at 6–8.  In 2014, the OCR began targeting specific schools' Title IX compliance—including Emory.  The OCR's investigation of Emory lasted about five years, eventually concluding with a host of findings regarding Emory's Title IX mismanagement.  *See id.* at 11–12.

In short, Emory faced tremendous pressure to improve its handling of sexual-misconduct complaints, and it responded.  In 2007, for instance, the university adopted a comprehensive "Sexual

Case 1:21-cv-02763-MHC   Document 36   Filed 08/01/24   Page 11 of 20
USCA11 Case: 22-13293    Document: 46-1    Date Filed: 08/01/2024    Page: 11 of 18

22-13293               Opinion of the Court                        11

Misconduct Policy," which it updated almost annually through the year 2020. That policy established procedures for investigations and hearings, and it incorporated many of the strategies recommended by the OCR—including, Doe contends, discouraging alleged perpetrators from cross-examining their alleged victims. *See* Br. of Appellant at 4–5. Doe also notes that in 2013 and 2019 the university hosted "RespectCon" events and in 2014 convened a "RealConsent" program. These events, Doe tells us, aimed to "engag[e] men in sexual violence prevention," *id.* at 8, and they featured language, Doe says, that made clear that Emory "responded [to public pressure] by targeting males as the perpetrators of sexual misconduct," Doc. 1 at 24. Finally, Doe notes that in the midst of all this government-directed pressure, Emory's campus newspaper reported on a 2018 suit brought by another male student alleging that the university had treated him unfairly in sexual-misconduct proceedings.

Doe's reliance on these events is misplaced for multiple reasons. For one thing, we held in *Samford* that the 2011 Dear Colleague Letter doesn't move the needle in cases, like this one, that post-date the letter's 2017 recission. *See* 29 F.4th at 691 ("Doe's allegations about a governmental policy that has been rescinded and replaced do not assist him in crossing the line between possibility and plausibility . . . ."). For another, although Doe's allegation that Emory "hosted" the RespectCon events might, if read in the light most favorable to him, imply that Emory took some editorial ownership of those events' messages, the allegation itself doesn't establish that the school didn't similarly "engag[e]" women in sexual-

violence prevention. *See Doe v. Rollins Coll.*, 77 F.4th 1340, 1356–57, 1360 (11th Cir. 2023).[1] And finally, as for the 1991 student protest and the 2018 suit, the district court rejected Doe's reliance on them on the grounds, respectively, that they were "too remote" in time and didn't cause a "'clamor of public and campus scrutiny over [Emory's] treatment of sexual assault complaints by female students.'" Doc. 25 at 20–21 (quoting *Doe v. Rollins Coll.*, 362 F. Supp. 3d 1205, 1210 (M.D. Fla. 2019)).

Even if we were to give Doe the benefit of the doubt (1) that *Samford*'s treatment of the rescinded 2011 letter is distinguishable because there is some indication here that in 2019 Emory was still operating under a regime roughly commensurate with it,[2] (2) that

---

[1] The most gendered evidence to which Doe points is a 2019 RespectCon event titled "Masculinity as a Failed Project." Doc. 1 at 25. But that evidence doesn't tell us about the other RespectCon-style events or, for instance, whether Emory ever formally embraced every speaker's message as its own. That single item simply isn't enough to push Doe's case over the line that separates the "possibility" that sex discrimination occurred from a "plausib[le]" allegation that it occurred. *Samford*, 29 F.4th at 688.

[2] In 2017, the OCR rescinded its 2011 Dear Colleague Letter and replaced it with a "Q&A" guidance explaining the new administration's Title IX policies. As Doe describes the new guidance, "[e]very student accused of sexual misconduct [had to] know that guilt [was] not predetermined," and "any school that use[d] a system biased toward finding a student responsible for sexual misconduct also commit[ted] discrimination." Br. of Appellant at 6. Emory, though, initially didn't follow the Q&A's recommendations; as best we can tell, as of 2019, when Doe's investigation and hearing occurred, the university was still operating under a regime more commensurate with the rescinded 2011 Dear Colleague Letter than the 2017 Q&A.

Case 1:21-cv-02763-MHC   Document 36   Filed 08/01/24   Page 13 of 20
USCA11 Case: 22-13293    Document: 46-1    Date Filed: 08/01/2024    Page: 13 of 18

22-13293               Opinion of the Court                        13

the 1991 protest was generationally significant, and (3) that the 2018 suit caused the requisite "clamor," he confronts a more significant, and we think fatal, problem: None of his allegations—concerning events either recent or more distant—gives rise to a reasonable inference of *sex discrimination*. None, that is—in the words of *Samford*—excludes the "obvious alternative explanation" that Emory's vigorous response was animated not by pro-female bias, but rather by "pro-complainant bias." 29 F.4th at 689.

\* \* \*

Bottom line: Despite marginal differences, this case is substantially similar to *Samford*. Similar procedural posture, similar allegations, and similar evidence. Perhaps unsurprisingly, we think that the same result follows. The allegations in Doe's complaint, while perhaps "consistent with" an inference that Emory discriminated against him based on his sex, "stop short of the line between possibility and plausibility." *Id.* at 688 (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 557 (2007)). They leave ample room for the "obvious alternative explanation" that Emory harbored a bias against alleged sexual-misconduct perpetrators and in favor of accusers. *Id.* at 689. Again, that may or not be just or fair. But it is not illegal, at least by reference to Title IX.[3]

---

[3] There is one loose end with respect to Doe's Title IX claim. Doe insists that the district court abused its discretion when it dismissed his Title IX claim (1) with prejudice and (2) without leave to amend. It did not. Under our precedent, "[w]here a request for leave to file an amended complaint simply is

**B**

In addition to his Title IX claim, Doe also brought two state-law breach-of-contract claims—one standard and another of the "intentional and knowing" variety—arising out of Emory's alleged failure to conduct its investigation and hearing in accordance with its own Sexual Misconduct Policy. The question is whether Emory's policy constituted a valid contract between Doe and the university. The district court held that it didn't and dismissed Doe's contract claims for failure to show that Emory "owed [him] a contractual obligation" in the first place. *Tims v. LGE Cmty. Credit Union*, 935 F.3d 1228, 1237 (11th Cir. 2019) (quoting *Norton v. Budget Rent a Car Sys., Inc.*, 705 S.E.2d 305, 306 (Ga. Ct. App. 2010)). For reasons we'll explain, we reverse the district court's dismissal of Doe's contract claims.

Under Georgia law, a breach-of-contract plaintiff must establish the following essential elements: (1) "parties able to contract"; (2) "consideration"; (3) "assent of the parties to the terms"; and (4) "subject matter upon which the contract may operate."

---

imbedded within an opposition memorandum, the issue has not been raised properly." *Rosenberg v. Gould*, 554 F.3d 962, 967 (11th Cir. 2009) (quotation marks omitted). Rather, a plaintiff who wishes to amend his complaint must file a motion seeking leave to do so. *See Cita Tr. Co. AG v. Fifth Third Bank*, 879 F.3d 1151, 1157 (11th Cir. 2018) ("[F]iling a motion is the proper method to request leave to amend a complaint." (quotation marks omitted)). Instead of filing a stand-alone motion, as our precedent requires, Doe tacked on a few paragraphs to the conclusion of his response to Emory's motion to dismiss. *See* Doc. 20 at 25. That failure forecloses his procedural challenge.

Case 1:21-cv-02763-MHC   Document 36   Filed 08/01/24   Page 15 of 20
USCA11 Case: 22-13293   Document: 46-1   Date Filed: 08/01/2024   Page: 15 of 18

22-13293                Opinion of the Court                    15

O.C.G.A. § 13-3-1. The district court rejected Doe's contract claims on the ground that Doe had failed to allege the third element: mutual assent. On appeal, Emory defends the district court's ruling in that respect and asserts, in addition, that its policy for handling sexual-misconduct complaints couldn't constitute a binding contract because the university retained the discretion to modify the policy's terms at any time. We address each ground in turn.

1

Contrary to the district court's suggestion, Doe's complaint *explicitly* alleged mutual assent: "Upon Plaintiff's matriculation to Emory, Plaintiff and Emory became mutually bound by the 'Policy 8.2: Sexual Misconduct' document." Doc. 1 at 42. More particularly, Doe contends that the parties manifested their mutual assent in (our word) three "stages": (1) Emory publicly promulgated the policy's terms; (2) Doe matriculated to Emory; and (3) Doe complied with the policy while at Emory. "Georgia law permits an expelled student to bring a breach of contract action against a private educational institution for failure to abide by the hearing procedures set forth in the student handbook," *Kuritsky v. Emory University*, 669 S.E.2d 179, 181 (Ga. Ct. App. 2008), and we can see no basis for concluding that a different rule would apply to a student, like Doe, who was suspended rather than expelled. *See also Morehouse College, Inc. v. McGaha*, 627 S.E.2d 39, 42 (Ga. Ct. App. 2005).

On appeal, Emory contends that Georgia law recognizes a distinction between express and implied contracts, that the sort of policy-based theory that Doe is pursuing here can support only an

Case 1:21-cv-02763-MHC   Document 36   Filed 08/01/24   Page 16 of 20
USCA11 Case: 22-13293    Document: 46-1    Date Filed: 08/01/2024    Page: 16 of 18

16               Opinion of the Court                22-13293

implied-contract claim, and that Doe didn't adequately allege an implied-contract claim in his complaint. *See* Br. of Appellee at 42. We disagree. Doe's complaint expressly alleged that his contract with Emory was both "express and implied." Doc. 1 at 4. That is sufficient.

The district court further held that Doe lacked actual knowledge of the policy's contents and, accordingly, that his matriculation to Emory and his compliance with the policy could well have been incidental rather than intentional and thus insufficient to establish his own assent. Again, we disagree. Doe pleaded facts consistent with his actual knowledge—in particular, that he knew the content of Emory's past and current policies so well that he was able to identify and explain the differences between them. Again, given the procedural posture, we have to take that assertion as true. We conclude, therefore, that Doe has adequately alleged that the parties mutually assented to an implied contract embodied in the sexual-misconduct policy.

2

Emory makes the additional argument that it was free to amend its Sexual Misconduct Policy unilaterally and, accordingly, that the policy couldn't form the basis of a valid contract. And Emory is correct that, as a matter of Georgia law, "if any term of [a] contract is amendable at the will of [one party], the entire contract [is] void for vagueness because there could be no assent of the parties to the terms of the contract." *Municipal Elec. Auth. of Ga. v. City of Calhoun*, 489 S.E.2d 599, 602 (Ga. Ct. App. 1997).

The question, therefore, is whether, based on the allegations in Doe's complaint, we can conclude that Emory actually *could* amend its policy at will. Emory answers "yes" for two reasons: (1) It changed its plan some 17 times between March 2007 and February 2020 alone, without any student body input; and (2) it updated its policy, by Doe's admission, "each new school year." Doc. 1 at 42. At least at this early stage of the proceedings, we're not convinced that Emory's amendment authority is the trump that it seems to assume. While it's true that the university has repeatedly revised its policy, the record reflects that most of the revisions have been relatively minor—say, to update campus officials' names and contact information, not to change substantive rules or procedural mechanisms. Moreover, and in any event, nothing in Doe's own complaint or any other undisputed record material supports Emory's contention that the student body had no input into policy amendments. To the contrary, the record reflects that at least one of the annual revisions was "based on community feedback." Doc. 15-2 at 28. So, what little we know about the policy-promulgation process suggests (1) that Emory's policy changed only minimally over time and (2) that the changes might well have been based, at least in part, on community input. Accordingly, we cannot conclude, based on the thin record before us, that Emory retained an

Case 1:21-cv-02763-MHC   Document 36   Filed 08/01/24   Page 18 of 20
USCA11 Case: 22-13293   Document: 46-1   Date Filed: 08/01/2024   Page: 18 of 18

18                    Opinion of the Court                    22-13293

absolute right to amend its policy that would render it effectively illusory and preclude the parties' mutual assent.[4]

★ ★ ★

In sum, we hold that at this stage of the proceedings (1) Doe has adequately pleaded that the parties mutually assented to an implied contract embodied in Emory's Sexual Misconduct Policy and (2) there is no basis for concluding that the university retained a unilateral right to amend its policy of the sort that would preclude mutual assent. We therefore reverse the dismissal of Doe's breach-of-contract claims and remand for further proceedings.

## IV

For the foregoing reasons, we **AFFIRM** the district court's dismissal with prejudice of Doe's Title IX claim, but we **REVERSE** its dismissal of Doe's breach-of-contract claims and **REMAND** for further proceedings consistent with this opinion.

---

[4] As noted in text, Doe also asserted what he called an "intentional and knowing" breach-of-contract claim. Emory insists that intentional breach of contract isn't a separate claim at all, but rather an upward variance of sorts from a standard breach—an aggravating factor, if you will. *See* Br. of Appellee at 48–49. The district court didn't reach that argument because it held that there was no contract to breach—intentionally or otherwise. Because we're reversing that determination, the question whether intentional breach of contract constitutes an independent cause of action will be back on the table, and the district court may address it on remand.

**UNITED STATES COURT OF APPEALS**
**FOR THE ELEVENTH CIRCUIT**

ELBERT PARR TUTTLE COURT OF APPEALS BUILDING
56 Forsyth Street, N.W.
Atlanta, Georgia 30303

David J. Smith
Clerk of Court

For rules and forms visit
www.ca11.uscourts.gov

August 01, 2024

MEMORANDUM TO COUNSEL OR PARTIES

Appeal Number: 22-13293-HH
Case Style: John Doe v. Emory University
District Court Docket No: 1:21-cv-02763-MHC

Opinion Issued
Enclosed is a copy of the Court's decision issued today in this case. Judgment has been entered today pursuant to FRAP 36. The Court's mandate will issue at a later date pursuant to FRAP 41(b).

Petitions for Rehearing
The time for filing a petition for panel rehearing is governed by 11th Cir. R. 40-3, and the time for filing a petition for rehearing en banc is governed by 11th Cir. R. 35-2. Except as otherwise provided by FRAP 25(a) for inmate filings, a petition for rehearing is timely only if received in the clerk's office within the time specified in the rules. **A petition for rehearing must include a Certificate of Interested Persons and a copy of the opinion sought to be reheard.** See 11th Cir. R. 35-5(k) and 40-1.

Costs
Each party to bear its own costs.

Bill of Costs
If costs are taxed, please use the most recent version of the Bill of Costs form available on the Court's website at www.ca11.uscourts.gov. For more information regarding costs, see FRAP 39 and 11th Cir. R. 39-1.

Attorney's Fees
The time to file and required documentation for an application for attorney's fees and any objection to the application are governed by 11th Cir. R. 39-2 and 39-3.

Appointed Counsel
Counsel appointed under the Criminal Justice Act (CJA) must submit a voucher claiming compensation via the eVoucher system no later than 45 days after issuance of the mandate or the filing of a petition for writ of certiorari. Please contact the CJA Team at (404) 335-6167 or

cja_evoucher@ca11.uscourts.gov for questions regarding CJA vouchers or the eVoucher system.

<u>Clerk's Office Phone Numbers</u>

| | | | |
|---|---|---|---|
| General Information: | 404-335-6100 | Attorney Admissions: | 404-335-6122 |
| Case Administration: | 404-335-6135 | Capital Cases: | 404-335-6200 |
| CM/ECF Help Desk: | 404-335-6125 | Cases Set for Oral Argument: | 404-335-6141 |

OPIN-1 Ntc of Issuance of Opinion